## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| | Case No. 1:06-cv-02157-RWR |
| | CLASS ACTION COMPLAINT |
| LOUISIANA WHOLESALE DRUG CO., INC., on behalf of themselves and al others similarly situated<br>Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| ASTRAZENECA PHARMACEUTICALS L.P., ASTRAZENECA L.P., ZENECA, INC., and ZENECA HOLDINGS, INC. | |
| Defendants | |

| | |
|---|---|
| BURLINGTON DRUG COMPANY, INC., DIK DRUG COMPANY, and KING DRUG COMPANY OF FLORENCE, INC., on behalf of themselves and al others similarly situated<br>Plaintiffs, | Case No. 1:07-cv-00041-RWR |
| | CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |
| v. | |
| ASTRAZENECA PHARMACEUTICALS L.P., ASTRAZENECA L.P., ZENECA, INC., and ZENECA HOLDINGS, INC. | |
| Defendants | |

## LWD PLAINTIFFS' MOTION
## FOR ENTRY OF PROPOSED CASE MANAGEMENT ORDER NO. 1

Louisiana Wholesale Drug Co., Inc., Burlington Drug Company, Inc., Dik Drug

Company, and King Drug Company of Florence, Inc. (collectively, the "LWD Plaintiffs"),

hereby moved for entry of proposed Case Management Order No. 1 ("CMO No. 1") (attached

hereto as Ex. A), (1) consolidating all similar direct purchaser antitrust class actions against

AstraZeneca Pharmaceuticals L.P. et al. ("AstraZeneca") and (2) appointing Garwin Gerstein &

Fisher LLP ("Garwin Gerstein") as lead counsel in the consolidated litigation.

In order to promote judicial economy and avoid duplication, the LWD Plaintiffs move

the Court to provide for the consolidation of these actions and any other class actions filed in or

transferred into this District on behalf of direct purchasers, for an organization of plaintiffs'

counsel as set forth in Case Management Order No. 1.[1]

Based upon the foregoing, LWD Plaintiffs respectfully request that Case Management

Order No. 1 be entered.

                                          Respectfully submitted,

Dated: January 31, 2007                    /s/ David U. Fierst, Esq.
                                          Stein, Mitchell & Mezines, LLP
                                          1100 Connecticut Avenue, NW
                                          Suite 1100
                                          Washington, DC 20036-4195
                                          Fax: (202) 296-8312
                                          E-mail: dfierst@steinmitchell.com

GARWIN GERSTEIN & FISHER LLP              BERGER & MONTAGUE, P.C.
Bruce E. Gerstein                         Daniel Berger
Barry S. Taus                             David F. Sorenson
Brett Cebulash                            Eric L. Cramer
Kevin Landau                              BERGER & MONTAGUE, P.C.
1501 Broadway, Suite 1416                 1622 Locust Street
New York, NY 10036                        Philadelphia, PA 19103
Tel: (212) 398-0055                       Tel: (800) 424-6690
Fax: (212) 764-6620                       Fax: (215) 875-4604

---

[1]Counsel for Plaintiffs has also conferred with counsel for Meijer, Inc., and Meijer Distribution, Inc. ("Meijer") which filed a class action purportedly on behalf of direct purchasers from Defendants. *Meijer, Inc. et al. v. AstraZeneca Pharmaceuticals L.P. et al.*, No. 06-cv-02155-RWR. Counsel for Meijer indicated that they do not support the leadership structure proposed in Proposed Case Management Order Number 1.

ODOM & DES ROCHES, L.L.P.
John Gregory Odom
Stuart E. Des Roches
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

PHELPS DUNBAR, LLP
Brent B. Barrier
365 Canal Street, Suite 2000
New Orleans, LA  70130
Tel: (504) 566-1311
Fax: (504) 568-9130

PERCY, SMITH & FOOTE, L.L.P.
David P. Smith
Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

KOZYAK TROPIN & THROCKMORTON
Adam Moskowitz
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

Counsel for the LWD Plaintiffs

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOUISIANA WHOLESALE DRUG CO., INC., on behalf of themselves and al others similarly situated<br>Plaintiffs,<br><br>v.<br><br>ASTRAZENECA PHARMACEUTICALS L.P., ASTRAZENECA L.P., ZENECA, INC., and ZENECA HOLDINGS, INC.<br><br>Defendants | Case No. 1:06-cv-02157-RWR<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| BURLINGTON DRUG COMPANY, INC., DIK DRUG COMPANY, and KING DRUG COMPANY OF FLORENCE, INC., on behalf of themselves and al others similarly situated<br>Plaintiffs,<br><br>v.<br><br>ASTRAZENECA PHARMACEUTICALS L.P., ASTRAZENECA L.P., ZENECA, INC., and ZENECA HOLDINGS, INC.<br><br>Defendants | Case No. 1:07-cv-00041-RWR<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**MEMORANDUM IN SUPPORT OF LWD PLAINTIFFS' MOTION
FOR ENTRY OF PROPOSED CASE MANAGEMENT ORDER NO. 1**

Louisiana Wholesale Drug Co., Inc., Burlington Drug Company, Inc., Dik Drug Company, and King Drug Company of Florence, Inc. (collectively, the "LWD Plaintiffs"), submit this memorandum in support of the LWD Plaintiffs' motion for entry of proposed Case Management Order No. 1 ("CMO No. 1") (attached hereto as Ex. A), (1) consolidating all

similar direct purchaser antitrust class actions against AstraZeneca Pharmaceuticals L.P. et al.

("AstraZeneca") and (2) appointing Garwin Gerstein & Fisher LLP ("Garwin Gerstein") as lead

counsel in the consolidated litigation.

To date, three nearly-identical antitrust class action complaints have been filed on behalf

entities which purchased omeprazole and/or any of its enantiomers directly from AstraZeneca at

supra-competitive prices, and all three of these actions have been filed in this district and

assigned to Judge Roberts.  They are: (a) *Louisiana Wholesale Drug Co., Inc. et al. v.*

*AstraZeneca Pharmaceuticals L.P. et al.*, No. 06-cv-02157-RWR; (b) *Burlington Drug*

*Company, Inc. et al. v. AstraZeneca Pharmaceuticals L.P. et al.*, No. 07-cv-00041-RWR; and (c)

*Meijer, Inc. et al. v. AstraZeneca Pharmaceuticals L.P. et al.*, No. 06-cv-02155-RWR.[1]

Proposed CMO No. 1 seeks to promote the orderly and efficient development of these

cases, and should be entered because (1) consolidation of these three class actions as well as any

later-filed or transferred class actions arising from the same facts under FED. R. CIV. P. 42(a)

would avoid unnecessary costs and delay, and (2) examination of the factors a court must

consider in appointing class counsel under  FED. R. CIV. P. 23(g)(1)(C)(i) – counsel's

investigation of the claims in the action, experience, knowledge, and resources – demonstrates

unequivocally that Garwin Gerstein is "best able to represent the interests of the class."  FED. R.

CIV. P. 23(g)(2)(B).

---

[1]The LWD Plaintiffs are not seeking consolidation with the two *non-class action* direct
purchaser cases that have also been filed in this district, *Walgreen Co. et al. v. AstraZeneca
Pharmaceuticals L.P. et al.*, No. 06-cv-02084-RWR; and *Rite Aid Corporation et al. v.
AstraZeneca Pharmaceuticals L.P. et al.*, No. 06-cv-02089-RWR.

As discussed below, Garwin Gerstein, together with its co-counsel, take seriously its responsibility to protect the interests of the classes it represents, and has repeatedly proved its ability to oversee the litigation of similar pharmaceutical antitrust cases – ultimately negotiating the settlement of such cases for hundreds of millions of dollars on behalf of class members. Here, the LWD Plaintiffs which comprise four of the five plaintiffs that have filed these class actions request the appointment of Garwin Gerstein as lead counsel.[2]  In addition to the four LWD Plaintiffs, representatives of six additional putative class members have submitted affidavits in support of appointing Garwin Gerstein as lead counsel in this litigation (attached hereto as Exs. B to G).  Based on Garwin Gerstein's experience in other similar cases, we expect the class to number approximately sixty to eighty class members.  Thus, a significant number of the stakeholders in this litigation have expressed a desire to have their chosen representative – Garwin Gerstein – take the leading role in the decisions that are of vital interest to the class.

Because Garwin Gerstein is among the most experienced and successful antitrust litigation firms in the country – especially in the area of pharmaceutical antitrust – and the LWD Plaintiffs' desire to establish a highly-efficient structure which will best yield the type of outstanding results which Garwin Gerstein and its co-counsel have achieved in past pharmaceutical antitrust cases, the LWD Plaintiffs' motion for entry of CMO No. 1 should be granted.

---

[2]The law firms supporting entry of CMO No. 1 include: Odom & Des Roches, L.L.P.; Percy, Smith & Foote, L.L.P.; Berger & Montague, P.C.; Phelps Dunbar, LLP; and Kozyak Tropin Throckmorton.

Plaintiff Meijer, Inc. which is represented by Cohen, Milstein, Hausfeld, & Toll, P.L.L.C. ("Cohen Milstein") does not support the leadership structure proposed in CMO No. 1**.**

## ARGUMENT

**I.     CONSOLIDATION OF THESE THREE NEARLY-IDENTICAL COMPLAINTS AS WELL AS ANY LATER-FILED OR TRANSFERRED CLASS ACTIONS ARISING FROM THE SAME FACTS IS APPROPRIATE.**

The three separate class action complaints, as well as any later-filed or transferred class action cases,[3] brought by direct purchasers of omeprazole and/or any of its enantiomers, making nearly-identical antitrust allegations against AstraZeneca should be consolidated.  Federal Rule of Civil Procedure 42(a)[4] gives a court "broad discretionary authority to consolidate cases." *Horn v. Raines*, 227 F.R.D. 1, 2 (D.D.C. 2005) (Leon, J.); *see also* Manual for Complex Litigation - Fourth Edition (2004) ("Manual") § 11.631.  This district has recognized the utility of consolidation in "help[ing to] alleviate 'needless duplication of time, effort, and expense on

---

[3]To date, there are no other direct purchaser antitrust class action cases based on the same facts pending in any other jurisdiction.

[4]Federal Rule of Civil Procedure 42(a) states:

> When actions involving a common question of law or fact are pending before the court it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

the part of the parties and the Court'." *Horn*, 227 F.R.D. at 2 (citation omitted).   Moreover, when a court finds consolidation appropriate, "the Court has the discretion to order the consolidation of subsequently-filed or transferred cases that allege similar facts as those alleged in the current [] suit." *Id.* at 2-3 (citation omitted).

Because the three direct purchaser class actions make nearly the same antitrust allegations and seek the same relief against the same defendant, litigating three separate cases at the same time would entail substantial unnecessary expense and time for both the parties and the Court.  Therefore, to avoid unnecessary costs and delay in litigating these three actions involving nearly-identical questions of law and fact, these cases as well as any later-filed or transferred class actions arising from the same facts should be consolidated.

## II.    GARWIN GERSTEIN IS BEST ABLE TO SERVE THE INTERESTS OF THE CLASS BECAUSE IT HAS VAST EXPERIENCE LEADING DIRECT PURCHASER PHARMACEUTICAL ANTITRUST LITIGATIONS.

The appointment of lead counsel is within the discretion of the Court and is based on the Court's determination of "which counsel will best serve the interest of the plaintiffs." *Horn*, 227 F.R.D. at 3.  In making this determination,

> courts consider, among other things, 'experience and prior success record, the number, size, and extent of involvement of represented litigations, the advanced stage of proceedings in a particular suit, and the nature of the causes of action alleged' .... [as well as] the quality of the pleadings, the economic interests of the plaintiffs, and the vigor with which the plaintiffs have prosecuted their lawsuits.

*Id.* (quoting 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 9.35 at 388 (4th ed. 2002)).

Garwin Gerstein should be appointed lead counsel because it is in the best interest of the plaintiffs' class.  Garwin Gerstein is a highly experienced and successful antitrust litigation firm

with a demonstrated record of fairly and adequately serving the interests of the classes it has

represented.[5]   For example, Garwin Gerstein has served as co-lead counsel in numerous direct

purchaser pharmaceutical antitrust actions, which resulted in outstanding settlements for the

benefit of class members – with an aggregate value of $655 million.  *See, e.g., In re Cardizem*

*Antitrust Litigation* (E.D.Mich.) ($110 million); *In re Buspirone Antitrust Litigation* (S.D.N.Y.)

($220 million); *In re Relafen Antitrust Litigation* (D. Mass.) ($175 million); *In re Terazosin*

*Hydrochloride Antitrust Litigation* (S.D.Fla.) ($75 million); *In re Remeron Antitrust Litigation*

 ($75 million).  Additionally, Garwin Gerstein is currently serving as court-appointed lead or co-

lead counsel in several other complex pharmaceutical antitrust litigations: *In reModafinil*

*Antitrust Litig.*, 06cv1797 (RBS) (E.D. Pa.); *In re Tricor Direct Purchaser Antitrust Litig.*,

05cv340 (KAJ) (D. Del.); *In re Oxycontin Antitrust Litigation,* Case No. 04-MDL-1603 (SHS)

(S.D.N.Y.); *In re Nifedipine Antitrust Litigation*, Case No. 03-MDL-1515 (RJL) (D.D.C.);

---

[5]A law firm's experience and knowledge are among the factors a court must consider under FED. R. CIV. P. 23 in determining counsel's ability to represent a class of plaintiffs.  *See* FED. R. CIV. P. 23(g)(1)(C)(i).  Under Rule 23, courts must also consider counsel's investigation of the potential claims and the resources it possesses to devote to the litigation.  *Id.*  In addition to Garwin Gerstein's knowledge and experience, discussed more fully below, Garwin Gerstein has performed an extensive investigation into the claims at issue here and possesses the resources necessary to serve the class as lead class counsel.

*In re Neurontin Antitrust Litigation,* MDL Docket No. 1479 (JCL) (D.N.J.); *In re K-Dur Antitrust Litigation*, Case No. 01-1652 (JAG) (D.N.J.); *In re Ciproflaxin Hydrochloride Antitrust Litigation*, MDL Docket No. 1383 (DGT) (E.D.N.Y.).[6] *See* Resume of Garwin Gerstein & Fisher LLP, attached hereto as Ex. H**.**

Indeed, Garwin Gerstein's leadership and excellence has been recognized repeatedly by the judges before whom it has appeared as class counsel.  As Judge Koeltl of the Southern District of New York recently commented in *In re Buspirone Patent and Antitrust Litigation*, 01-MD-1410; 01-MD-1413 (S.D.N.Y.) (JGK), "[t]he quality of representation was very high.  The case was vigorously litigated on both sides and the quality of the lawyers in the case was excellent."  *See* Transcript of April 11, 2003 Proceedings at 41-42, attached hereto as Exhibit I.  Similarly, in approving the $110 million dollar settlement and attorneys' fee award in *Cardizem*, Judge Nancy G.  Edmunds stated:

> ...this represents an excellent settlement for the class and reflects the outstanding effort on the part of highly experienced, skilled, and hard working Class Counsel.  As Class Counsel's affidavits show, their efforts were not only successful, but were highly organized and efficient in addressing numerous complex issues raised in this litigation, including highly technical Federal Drug Administration ("FDA") regulatory issues, patent, manufacturing, financial and related causation issues.

 *In re Cardizem Antitrust Litigation*, Case No. 99-md-1278 (E.D.Mich.) (NGE) (Nov.  26, 2002 Order at 15 - 16), attached hereto as Ex J.

---

[6]Garwin Gerstein is also currently serving as court appointed lead or co-lead in several other major, complex antitrust litigations.  *See, e.g., In re Pulse Oximetry Antitrust Litigation*, Case No. CV-05-6419 MRP (AJWx) (C.D. Cal.); *In re Hypodermic Products Direct Purchaser Antitrust Litigation*, Case No.  CV-05-1602 (JLL/RJH) (D.N.J.).

Therefore, because Garwin Gerstein is one of the most experienced and successful antitrust litigation firms in the country with a recognized record of fairly and adequately representing the interests of the classes it has represented, it is in the best interest of the plaintiffs' class to appoint Garwin Gerstein as lead counsel of the consolidated litigation.

**III.I.    A SIGNIFICANT PORTION OF CLASS MEMBERS BELIEVE THAT GARWIN GERSTEIN'S PARTICIPATION IN THIS LITIGATION AS LEAD COUNSEL IS IN THE BEST INTEREST OF THE CLASS.**

In addition to the named plaintiffs represented by Garwin Gerstein and its co-counsel, six additional class members affirmatively support this motion.   These entities are familiar with the "extraordinary settlements with an aggregate value of $655 million" reached in similar antitrust cases and understand that Garwin Gerstein was the "key force in effectuating th[ose] settlements" and "trust [Garwin Gerstein] to act as a fiduciary of the Class."  *See* Affidavits collected in Ex. B to G at ¶¶ 5 - 6.  Thus, together with the four pharmaceutical wholesalers which comprise the LWD Plaintiffs, ten class members – a significant portion of class members who are sophisticated business entities and have a significant economic interest in this litigation – support Garwin Gerstein's appointment as lead counsel.  By contrast, the sole plaintiff who does not support the leadership structure in proposed CMO No. 1 – Meijer, Inc., Cohen Milstein's client – has a substantially smaller economic interest when compared with the four LWD Plaintiffs and six putative class members who affirmatively support the appointment of Garwin Gerstein as lead counsel in this litigation.

A Northern District of Ohio decision in which the court was presented with two competing proposals for appointment of lead counsel in a consolidated antitrust class action case is instructive here.  *In re Scrap Metal Antitrust Litigation*, No. 1:02-cv-844, 2002 WL 31988203

(N.D. Ohio Aug. 5, 2002) (attached here as Ex. K).  The court in that case, guided by the Private

Securities Litigation Reform Act ("PSLRA"), found that the most appropriate law firm to serve

as lead counsel in an antitrust class action was the firm recommended by the plaintiff with the

most significant stake in the litigation.  The court reasoned that "the plaintiff with the largest

stake in the litigation will be more likely to monitor and control its counsel."  *Id.* at \*2; *see also*

Manual at § 21.272 (stating that the PSLRA, under which plaintiffs with the largest financial

interest in the litigation direct the course of the litigation - including choosing lead counsel -

"provides a useful analogy for similar class actions brought by sophisticated plaintiffs with large

losses or sizeable claims").  The court was further persuaded by the lead plaintiff's actual

involvement in the litigation, stating: "It is clear, moreover, that these presumptions are not

merely hypothetical - Lincoln Electric's in-house counsel both appeared at the hearing and

addressed the Court regarding the scope of its stake in the litigation." *Id.*[7]

Here, not only do the four LWD Plaintiffs and six putative class members have the most

significant financial stake in this litigation (*vis-a-vis* the other named plaintiff, Meijer, Inc.), but

Plaintiff Louisiana Wholesale Drug Co., Inc. has also been actively involved in previous

pharmaceutical antitrust cases (*vis-a-vis* Meijer, Inc.).  In particular, Gayle White, President and

Marketing Manager of Louisiana Wholesale Drug Co., Inc., has had an extensive personal

involvement in prior cases, including mediations that led to the successful settlements in several

---

[7]The *In re Scrap Metal Antitrust Litigation* court also noted that "consideration of the
'first-to-file' status when making lead counsel determinations has been rejected by many courts."
*Id*. at \*2.

9

of the pharmaceutical antitrust cases described above - *e.g. In re Cardizem Antitrust Litigation* (E.D.Mich.) ($110 million);  *In re Relafen Antitrust Litigation* (D. Mass.) ($175 million); *In re Terazosin Hydrochloride Antitrust Litigation* (S.D.Fla.) ($75 million); *and In re Remeron Antitrust Litigation* ($75 million).

As in *In re Scrap Metal Antitrust Litigation*, the plaintiffs with the most significant financial stake in this litigation and more active involvement in other similar past cases (*vis-a-vis* the other named plaintiff) - the LWD Plaintiffs and other absent class members – have voiced their choice of counsel Garwin Gerstein to lead this litigation.

## CONCLUSION

For the reasons stated above, the Court should grant the LWD Plaintiffs' motion for entry of CMO No. 1.

Dated: January 31, 2007

 /s/ David U. Fierst, Esq.
Stein, Mitchell & Mezines, LLP
1100 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036-4195
Fax: (202) 296-8312
E-mail: dfierst@steinmitchell.com

GARWIN GERSTEIN & FISHER LLP
Bruce E. Gerstein
Barry S. Taus
Brett Cebulash
Kevin Landau
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

BERGER & MONTAGUE, P.C.
Daniel Berger
David F. Sorenson
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (800) 424-6690
Fax: (215) 875-4604

ODOM & DES ROCHES, L.L.P.
John Gregory Odom
Stuart E. Des Roches
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

PERCY, SMITH & FOOTE, L.L.P.
David P. Smith
Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

PHELPS DUNBAR, LLP
Brent B. Barrier
365 Canal Street, Suite 2000
New Orleans, LA  70130
Tel: (504) 566-1311
Fax: (504) 568-9130

KOZYAK TROPIN & THROCKMORTON
Adam Moskowitz
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

Counsel for the LWD Plaintiffs

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOUISIANA WHOLESALE DRUG CO., | Case No. 1:06-cv-02157-RWR |
| BURLINGTON DRUG COMPANY, INC., DIK DRUG COMPANY, and KING DRUG COMPANY OF FLORENCE, INC., on behalf of themselves and al others similarly situated<br>Plaintiffs, | Case No. 1:07-cv-00041-RWR<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| v. | |
| ASTRAZENECA PHARMACEUTICALS L.P., ASTRAZENECA L.P., ZENECA, INC., and ZENECA HOLDINGS, INC.<br><br>Defendants | |

| | |
|---|---|
| MEIJER, INC., on behalf of themselves and al others similarly situated<br>Plaintiffs, | Case No. 1:06-cv-02155-RWR<br><br>CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| ASTRAZENECA PHARMACEUTICALS L.P., ASTRAZENECA L.P., ZENECA, INC., and ZENECA HOLDINGS, INC.<br><br>Defendants | |

**[PROPOSED] CASE MANAGEMENT ORDER NO. 1**

**WHEREAS**, several class actions have been filed against AstraZeneca Pharmaceuticals

L.P., AstraZeneca L.P., Zeneca, Inc., and Zeneca Holdings, Inc. (collectively "AstraZeneca" or

"Defendants"), in the United States District Court for the District of Columbia for alleged

violations of the antitrust laws regarding the sale of omeprazole and/or any of its enantiomers

1

(including the prescription drugs Prilosec, Nexium and any AB-rated generic equivalents of either) by Defendants; and

WHEREAS, in order to promote judicial economy and avoid duplication, the Court finds that it would be appropriate to provide for the consolidation of the above-captioned actions and any other class actions filed in or transferred to this District on behalf of direct purchasers, and for the appointment of Lead Counsel for Plaintiffs to coordinate the efforts of counsel in these actions.

IT IS ORDERED as follows:

I.    CONSOLIDATION OF ACTIONS

Pursuant to FED. R. CIV. P. 42(a), the above captioned actions (each of which is brought as a class action and each of which asserts similar claims under Section 2 of the Sherman Act, 15 U.S.C. § 2 shall be consolidated for pre-trial proceedings, discovery, and trial (the "Consolidated Actions").

II.    MASTER DOCKET AND SEPARATE ACTION DOCKETS

A Master Docket is hereby established for the Consolidated Actions and for all other cases which may be filed in or transferred to this Court and consolidated herewith.  The Master Docket shall be Case No. 1:06-cv-02157-RWR.  Entries in the Master Docket shall be applicable to these Consolidated Actions as more fully set forth below.  Separate dockets shall also be maintained for each of the actions comprising the Consolidated Actions, and entries shall be made therein in accordance with the regular procedures of the Clerk of the Court, except as modified by this Order.

III.    MASTER FILE AND SEPARATE ACTION FILES

2

A Master File is hereby established for these Consolidated Actions and for all other cases which may be filed in or transferred to this Court and consolidated herewith. The Master File shall be Case No. 1:06-cv-02157-RWR. The original of this Order shall be filed by the Clerk of the Court in the Master File herein established. The Clerk of Court shall maintain a separate file for each of the actions comprising the Consolidated Actions and filings shall be made therein in accordance with the regular procedures of the Clerk of Court except as modified by this Order. The Clerk of Court shall file a copy of this Order in each such separate file.

## IV.    CAPTION OF CASES

    A.    Every pleading filed in the Consolidated Actions shall bear the following caption:

```
_____
                                        )
IN RE OMEPRAZOLE DIRECT                 )
PURCHASER ANTITRUST LITIGATION  ) Master File No. 1:06-cv-02157-RWR
                                        )
_____ )
                                        )
THIS DOCUMENT RELATES TO:       )
                                        )
_____ )
```

All papers previously filed and served to date in either of the actions consolidated herewith are deemed part of the record in the Consolidated Actions.

    B.    When a pleading or other court paper filed in the Consolidated Actions is intended to apply to all actions therein, the words "All Actions" shall appear immediately after the words "THIS DOCUMENT RELATES TO:" in the caption set out above. When a pleading or other court paper is intend to be applicable only to one, or some, but not all of the Consolidated Actions, the party filing the document shall indicate the action(s) to which the document is intended to be applicable by last name of the named plaintiff(s) and the docket

number(s).

## V.    <u>FILING AND DOCKETING</u>

A.       When a paper is filed and the caption, pursuant to Section IV.B. above, shows that it is to be applicable to "All Actions," the Clerk of Court (or the party filing via ECF) shall file such paper in the Master File and note such filing in the Master Docket.  No further papers need be filed or docket entries made.

B.       When a paper is filed and the caption, pursuant to Section IV.B. above, shows that it is to be applicable to fewer than all of the Consolidated Actions, the Clerk of Court (or the party filing via ECF) shall file an original of such paper in the Master File and a copy in the file of each specific action to which the paper is intended to be applicable, and shall note such filing in the Master Docket and in the docket of each such action. It shall be the responsibility of the party filing such paper to supply the Clerk of Court with sufficient copies of any paper to facilitate compliance with the directions of this paragraph.

## VI.   APPLICATION OF THIS ORDER TO <u>SUBSEQUENTLY FILED OR TRANSFERRED CASES</u>

Counsel in the Consolidated Actions shall call to the attention of the Court the filing or transfer of any related direct purchaser action arising out of similar facts and circumstances and that therefore might properly be consolidated with the Consolidated Actions. Counsel in the Consolidated Actions shall promptly mail a copy of this Order to counsel for the plaintiff(s) in each such subsequently filed or transferred direct purchaser action and to counsel for any Defendants in each such action not already a party to any action then consolidated. Promptly

4

thereafter, upon notice to counsel for the parties in each such action, counsel for plaintiffs in the

Consolidated Actions and counsel for Defendants shall submit to the Court a proposed

Order consolidating any such action. Any party objecting to the application of this Order to such

a subsequently filed or transferred action, or to the subsequently filed or transferred actions

consolidation, shall, within twenty (20) days after the date upon which such a copy of this Order

is mailed by counsel in the Consolidated Actions to counsel for such party, file a motion seeking

relief from this Order.

## VII.    ORGANIZATION OF COUNSEL

A.    The Court designates the following to act on behalf of all plaintiffs in the

Consolidated Direct Purchaser Class Actions, with the responsibilities hereinafter described:

1. As liaison counsel in the Consolidated Direct Purchaser Class Actions:

> David U. Fierst, Esq.
> STEIN, MITCHELL & MEZINES LLP
> 1100 Connecticut Avenue, N.W.
> Suite 1100
> Washington, D.C. 20036
> Tel: (202) 737-7777
> Fax: (202) 296-8312

2. As lead counsel in the Consolidated Direct Purchaser Class Actions:

> Bruce E. Gerstein, Esq.
> Barry S. Taus, Esq.
> Brett Cebulash, Esq.
> Kevin Landau, Esq.
> GARWIN GERSTEIN & FISHER LLP
> 1501 Broadway, Suite 1416
> New York, NY 10036
> Tel: (212) 398-0055
> Fax: (212) 764-6620

B.    Liaison Counsel, under the direction of Lead Counsel, in the Consolidated Direct

Purchaser Class Actions is charged with performing on behalf of all Plaintiffs in those respective actions administrative matters such as communications between the Court and other counsel (including receiving and distributing notices, orders, motions and briefs on behalf of the group), advising parties of developments in the case and otherwise assisting in the coordination of activities and positions.

C.     Lead Counsel shall have primary authority over the following matters on behalf of all plaintiffs in the Consolidated Direct Purchaser Class Actions: (a) convening meetings of counsel; (b) initiation, response, scheduling, briefing and argument of all motions; (c) the scope, order and conduct of all discovery proceedings; (d) such work assignments to other counsel as they may deem appropriate; (e) the retention of experts; (f) designation of which attorneys may appear at hearings and conferences with the Court; (g) the timing and substance of any settlement negotiations with Defendants; and (h) other matters concerning the prosecution of or resolution of the Consolidated Direct Purchaser Class Actions.  Lead Counsel shall be responsible for the overall direction and administration of the Consolidated Direct Purchaser Class Actions.

D.     No motion shall be initiated or filed on behalf of any plaintiff in the Consolidated Direct Purchaser Class Actions except through Lead Counsel.

E.     Lead Counsel and Liaison Counsel (under the direction of Lead Counsel) in the Consolidated Direct Purchaser Class Actions shall have sole authority to communicate with defendants' counsel and the Court on behalf of all plaintiffs.  Defendants' counsel may rely on all agreements made with Lead Counsel or Liaison Counsel (under the direction of Lead Counsel) and such agreements shall be binding on all counsel in the Consolidated Direct

Purchaser Class Actions.

F.    The organizational structure of plaintiffs' counsel established in paragraph VII. herein shall apply to plaintiffs' counsel in the Consolidated Direct Purchaser Class Actions and any other related action filed and consolidated subsequently.

G.    **Time Records.** Plaintiffs' counsel shall keep contemporaneous time records and shall periodically submit summaries or other records of time and expenses to Lead Counsel, or their designee.

## VIII.    FILING AND SERVICE OF DOCUMENTS

A.    **Orders.** A copy of each order in any of the Consolidated Actions will be provided to plaintiffs' Lead Counsel and to defendants' counsel of record.

B.    **Pleadings, Motions, and Other Documents.** Any party in the Consolidated Actions shall effect service of all papers on all parties in the Consolidated Actions as follows: (a) defendants' counsel of record shall serve all papers upon Lead Counsel and Liaison Counsel in the Consolidated Actions, and (b) counsel for plaintiffs in the Consolidated Actions shall serve all papers on each of defendants' counsel of record.

C.    Filing and service of any document in the Consolidated Actions may be effected by transmitting a copy (for service) or the original (for filing) of the document by overnight courier for next-business-day delivery, by telecopier (for service only), or by hand delivery. Filing or service, as the case may be, shall be deemed effective on the date on which the document is sent (i.e., provided to the overnight courier even though delivery will not occur until the next business day), is telecopied (for service only), or is hand delivered.

D.    Notwithstanding any other provisions herein, the Parties may file and serve all

papers in accordance with the Electronic Case Filing Policies and Procedures ("ECF

Procedures") of this Court.  Defendants' service of papers by ECF Procedures constitutes service

on Plaintiffs.  Plaintiffs may serve papers on Defendants by ECF Procedures.  To the extent that

ECF Procedures do not apply, the parties shall serve papers in the manner described above.

**SO ORDERED.**

Dated: _____, 2007          _____
                                            Hon. Richard W. Roberts, U.S.D.J.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------X

LOUISIANA WHOLESALE DRUG CO., INC
    2085 I-49
    South Service Road
    Sunset, Louisiana 70584
on behalf of itself and all others similarly situated,

                                          Case No. 1:06-cv-02157-HJW
                                          Judge Richard W. Roberts

                  Plaintiffs,

          v.

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

                  Defendants.
-----------------------------------------------------------X

AFFIDAVIT OF ERIC SCHUSS

    I, Eric Schuss, being duly sworn, depose and say, under penalty of perjury, the following:

    1.    I am Chairman of the Board of Bellco Drug Corp. (the "Company"). I have the authority to execute this Affidavit on behalf of the Company.

    2.    The Company is a full-line, full-service wholesale distributor of over 20,000 branded, generic, and biotech pharmaceuticals, vaccines, and health & beauty care products. The Company's national customer base includes independent and chain retail pharmacies, government agencies, and an array of institutional pharmacy markets. Through two distribution facilities located in N. Amityville, New York and Brea, California, the Company is positioned to

1

provide service to customers throughout the United States.

3.    The Company is a direct purchaser of Nexium from Defendants Astrazeneca
Pharmaceuticals L.P.; Astrazeneca L.P.; Zeneca, Inc.; and Zeneca Holdings, Inc., and as such is
a member of the putative class in the above captioned litigation.  In terms of dollar volume,
Nexium is one of the top pharmaceutical products purchased by the Company.

4.    The Company has been a member of the direct purchaser class in other
pharmaceutical antitrust cases including *In re Buspirone Antitrust Litig.*, MDL Docket No. 1410,
U.S.D.C., S.D.N.Y.; *In re Cardizem CD Antitrust Litig.*, MDL Docket No. 1278, U.S.D.C.,
E.D.Mich.; *In re Relafen Antitrust Litig.*, Master File No. 01-12239, U.S.D.C., D.Mass.; *In re
Terazosin Hydrochloride Antitrust Litig.*, MDL Docket No. 1317, U.S.D.C., S.D. Fla.; and *In re
Remeron Antitrust Litig.*, Civil Action No. 03-cv-323, U.S.D.C., D.N.J.

5.    The law firm of Garwin, Gerstein & Fisher, LLP ("Garwin Gerstein") was lead or
co-lead counsel in each of the cases listed in Paragraph 4 above.  Those cases resulted in
extraordinary settlements with an aggregate value of $655 million.  As lead or co-lead counsel in
those cases, Garwin Gerstein always acted in the Class's best interest and kept my Company
apprised of the status of the litigation.  In all of my dealings with Garwin Gerstein, its attorneys
have treated me with the utmost respect.

6.    I believe that Garwin Gerstein was the key force in effectuating the settlements of
the actions listed in Paragraph 4 above.  I am confident in Garwin Gerstein's ability to

2

effectively lead in the prosecution of this litigation and trust them to act as a fiduciary for the class. I believe that Garwin Gerstein's participation in this action as lead counsel is in the Company's best interest.

7.    In consideration of the above and foregoing, The Company respectfully requests that the Court give due consideration to Garwin Gerstein's leadership in the management of this case.

I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief, this _18_ day of January, 2007.

Bellco Drug Corp.

_____
Eric Schuss, **Chairman of the Board**

Sworn to and subscribed before me, Notary Public, on this _18th_ day of January, 2007.

_____
Notary Public

KAREN GIRILLO
NOTARY PUBLIC, STATE OF NEW YORK
No. 01GI6070727
QUALIFIED IN SUFFOLK COUNTY
MY COMMISSION EXPIRES MARCH 11, 20_10_

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------------------------------------------X

LOUISIANA WHOLESALE DRUG CO., INC
    2085 I-49
    South Service Road
    Sunset, Louisiana 70584
on behalf of itself and all others similarly situated,

                                   Case No. 1:06-cv-02157-HJW
                                   Judge Richard W. Roberts

                Plaintiffs,

           v.

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

                Defendants.
----------------------------------------------------------------X

AFFIDAVIT OF TED SCHERR

I, Ted Scherr, being duly sworn, depose and say, under penalty of perjury, the following:

1.     I am President / Chief Executive Officer of Dakota Drug, Inc. (the "Company"). I
have the authority to execute this Affidavit on behalf of the Company.

2.     The Company, located in Minot, North Dakota, was founded in 1948. As an
independent full service healthcare distributor, they provide service to pharmacies, retail drug
stores, and hospitals in the Midwestern United States through the distribution of pharmaceuticals,
over the counter health and beauty care products, and giftware.

1

3.    The Company is a direct purchaser of Nexium from Defendants Astrazeneca Pharmaceuticals L.P.; Astrazeneca L.P.; Zeneca, Inc.; and Zeneca Holdings, Inc., and as such is a member of the putative class in the above captioned litigation. In terms of dollar volume, Nexium is one of the top pharmaceutical products purchased by the Company.

4.    The Company has been a member of the direct purchaser class in other pharmaceutical antitrust cases including *In re Buspirone Antitrust Litig.*, MDL Docket No. 1410, U.S.D.C., S.D.N.Y.; *In re Cardizem CD Antitrust Litig.*, MDL Docket No. 1278, U.S.D.C., E.D.Mich.; *In re Relafen Antitrust Litig.*, Master File No. 01-12239, U.S.D.C., D.Mass.; *In re Terazosin Hydrochloride Antitrust Litig.*, MDL Docket No. 1317, U.S.D.C., S.D. Fla.; and *In re Remeron Antitrust Litig.*, Civil Action No. 03-cv-323, U.S.D.C., D.N.J.

5.    The law firm of Garwin, Gerstein & Fisher, LLP ("Garwin Gerstein") was lead or co-lead counsel in each of the cases listed in Paragraph 4 above. Those cases resulted in extraordinary settlements with an aggregate value of $655 million. As lead or co-lead counsel in those cases, Garwin Gerstein always acted in the Class's best interest and kept my Company apprised of the status of the litigation. In all of my dealings with Garwin Gerstein, its attorneys have treated me with the utmost respect.

6.    I believe that Garwin Gerstein was the key force in effectuating the settlements of the actions listed in Paragraph 4 above. I am confident in Garwin Gerstein's ability to effectively lead in the prosecution of this litigation and trust them to act as a fiduciary for the class. I believe that Garwin Gerstein's participation in this action as lead counsel is in the

2

Company's best interest.

    7.    In consideration of the above and foregoing, The Company respectfully requests that the Court give due consideration to Garwin Gerstein's leadership in the management of this case.

    I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief, this _/5_ day of January, 2007.

                    **Dakota Drug, Inc.**

                    **Ted Scherr, President/C.E.O.**

                    Sworn to and subscribed before me, Notary Public, on this _/5_ day of January, 2007.

                    Notary Public

CINDY LOHSE
Notary Public
State of North Dakota
My Commission Expires Apr. 16, 2010

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------X

LOUISIANA WHOLESALE DRUG CO., INC
    2085 I-49
    South Service Road
    Sunset, Louisiana 70584
on behalf of itself and all others similarly situated,

                           Case No. 1:06-cv-02157-HJW
                           Judge Richard W. Roberts

                    Plaintiffs,

                 v.

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

                  Defendants.

-------------------------------------------------------------X

AFFIDAVIT OF DAVID MCQUEARY

    I, David McQueary, being duly sworn, depose and say, under penalty of perjury, the

following:

    1.    I am Vice-president of McQueary Bros. Wholesale Drug Company (the

"Company"). I have the authority to execute this Affidavit on behalf of the Company.

    2.    McQueary Bros. Wholesale Drug Company is an independent regional

pharmaceutical wholesaler located in Springfield, Missouri. Since beginning operation in 1924,

McQueary Bros. has expanded its service area to include seven states in the Midwest and South

U.S.: Missouri, Arkansas, Illinois, Iowa, Kansas, Oklahoma, Nebraska.

\

3.    The Company is a direct purchaser of Nexium from Defendants Astrazeneca Pharmaceuticals L.P.; Astrazeneca L.P.; Zeneca, Inc.; and Zeneca Holdings, Inc., and as such is a member of the putative class in the above captioned litigation.  In terms of dollar volume, Nexium is one of the top pharmaceutical products purchased by the Company.

4.    The Company has been a member of the direct purchaser class in other pharmaceutical antitrust cases including *In re Buspirone Antitrust Litig.,* MDL Docket No. 1410, U.S.D.C., S.D.N.Y.; *In re Cardizem CD Antitrust Litig.,* MDL Docket No. 1278, U.S.D.C., E.D.Mich.; *In re Relafen Antitrust Litig.,* Master File No. 01-12239, U.S.D.C., D.Mass.; *In re Terazosin Hydrochloride Antitrust Litig.,* MDL Docket No. 1317, U.S.D.C., S.D. Fla.; and *In re Remeron Antitrust Litig.,* Civil Action No. 03-cv-323, U.S.D.C., D.N.J.

5.    The law firm of Garwin, Gerstein & Fisher, LLP ("Garwin Gerstein") was lead or co-lead counsel in each of the cases listed in Paragraph 4 above.  Those cases resulted in extraordinary settlements with an aggregate value of $655 million.  As lead or co-lead counsel in those cases, Garwin Gerstein always acted in the Class's best interest and kept my Company apprised of the status of the litigation.  In all of my dealings with Garwin Gerstein, its attorneys have treated me with the utmost respect.

6.    I believe that Garwin Gerstein was the key force in effectuating the settlements of the actions listed in Paragraph 4 above.  I am confident in Garwin Gerstein's ability to effectively lead in the prosecution of this litigation and trust them to act as a fiduciary for the

class. I believe that Garwin Gerstein's participation in this action as lead counsel is in the Company's best interest.

7.    In consideration of the above and foregoing, The Company respectfully requests that the Court give due consideration to Garwin Gerstein's leadership in the management of this case.

I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief, this ___22___ day of January, 2007.

McQueary Bros. Wholesale Drug Company

David McQueary, Vice-president

Sworn to and subscribed before me, Notary Public, on this 22nd day of January, 2007.

TERESA R. WHITE
My Commission Expires
January 25, 2008
Lawrence County

Notary Public
Teresa R. White

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------X

LOUISIANA WHOLESALE DRUG CO., INC
    2085 I-49
    South Service Road
    Sunset, Louisiana 70584
on behalf of itself and all others similarly situated,

                                         Case No. 1:06-cv-02157-HJW
                                         Judge Richard W. Roberts

                Plaintiffs,

          v.

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

                Defendants.
------------------------------------------------------------X

AFFIDAVIT OF TONY RATTINI

    I, Tony Rattini, being duly sworn, depose and say, under penalty of perjury, the

following:

    1.     I am Executive Vice-president of Miami-Luken, Inc. (the "Company"). I have the

authority to execute this Affidavit on behalf of the Company.

    2.     Miami-Luken is a full line wholesale pharmaceutical supplier to retail pharmacies

in Ohio, Indiana, Kentucky, Pennsylvania, and West Virginia. The inventory of over 22,000

items including most available pharmaceuticals. The company operates out of Springboro, Ohio.

1

3.    The Company is a direct purchaser of Nexium from Defendants Astrazeneca Pharmaceuticals L.P.; Astrazeneca L.P.; Zeneca, Inc.; and Zeneca Holdings, Inc., and as such is a member of the putative class in the above captioned litigation. In terms of dollar volume, Nexium is one of the top pharmaceutical products purchased by the Company.

4.    The Company has been a member of the direct purchaser class in other pharmaceutical antitrust cases including *In re Buspirone Antitrust Litig.*, MDL Docket No. 1410, U.S.D.C., S.D.N.Y.; *In re Cardizem CD Antitrust Litig.*, MDL Docket No. 1278, U.S.D.C., E.D.Mich.; *In re Relafen Antitrust Litig.*, Master File No. 01-12239, U.S.D.C., D.Mass.; *In re Terazosin Hydrochloride Antitrust Litig.*, MDL Docket No. 1317, U.S.D.C., S.D. Fla.; and *In re Remeron Antitrust Litig.*, Civil Action No. 03-cv-323, U.S.D.C., D.N.J.

5.    The law firm of Garwin, Gerstein & Fisher, LLP ("Garwin Gerstein") was lead or co-lead counsel in each of the cases listed in Paragraph 4 above. Those cases resulted in extraordinary settlements with an aggregate value of $655 million. As lead or co-lead counsel in those cases, Garwin Gerstein always acted in the Class's best interest and kept my Company apprised of the status of the litigation. In all of my dealings with Garwin Gerstein, its attorneys have treated me with the utmost respect.

6.    I believe that Garwin Gerstein was the key force in effectuating the settlements of the actions listed in Paragraph 4 above. I am confident in Garwin Gerstein's ability to effectively lead in the prosecution of this litigation and trust them to act as a fiduciary for the class. I believe that Garwin Gerstein's participation in this action as lead counsel is in the

2

Company's best interest.

7.    In consideration of the above and foregoing, The Company respectfully requests that the Court give due consideration to Garwin Gerstein's leadership in the management of this case.

I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief, this _16_ day of January, 2007.

**Miami-Luken, Inc.**

Tony Rattini

**Tony Rattini, Executive Vice-president**

Sworn to and subscribed before me, Notary Public, on this _16th_ day of January, 2007.

Sharon R. Dearing

Notary Public

SHARON R. DEARING, Notary Public
In and for the State of Ohio
My Commission Expires June 3, 2010

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------X

LOUISIANA WHOLESALE DRUG CO., INC
     2085 I-49
     South Service Road
     Sunset, Louisiana 70584
on behalf of itself and all others similarly situated,

                                                Case No. 1:06-cv-02157-HJW
                                              Judge Richard W. Roberts

                     Plaintiffs,

           v.

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

                    Defendants.
------------------------------------------------------------------X

## AFFIDAVIT OF KEN COUCH

    I, Ken Couch, being duly sworn, depose and say, under penalty of perjury, the following:

    1.     I am President of Smith Drug Company (the "Company"). I have the authority to execute this Affidavit on behalf of the Company.


    2.     The Company is a division of J M Smith Corporation, South Carolina's third largest privately held company; Smith Drug Company is the oldest division of J M Smith Corporation. Smith Drug Company services over 1,300 pharmacies in South Carolina, North Carolina, Georgia, Florida, Tennessee, Virginia, West Virginia, Alabama, Mississippi, Louisiana, Arkansas, Missouri, Kentucky and Texas through facilities located in Spartanburg,

1

South Carolina and Paragould, Arkansas.

3.      The Company is a direct purchaser of Nexium from Defendants Astrazeneca Pharmaceuticals L.P.; Astrazeneca L.P.; Zeneca, Inc.; and Zeneca Holdings, Inc., and as such is a member of the putative class in the above captioned litigation.  In terms of dollar volume, Nexium is one of the top pharmaceutical products purchased by the Company.

4.      The Company has been a member of the direct purchaser class in other pharmaceutical antitrust cases including *In re Buspirone Antitrust Litig.*, MDL Docket No. 1410, U.S.D.C., S.D.N.Y.; *In re Cardizem CD Antitrust Litig.*, MDL Docket No. 1278, U.S.D.C., E.D.Mich.; *In re Relafen Antitrust Litig.*, Master File No. 01-12239, U.S.D.C., D.Mass.; *In re Terazosin Hydrochloride Antitrust Litig.*, MDL Docket No. 1317, U.S.D.C., S.D. Fla.; and *In re Remeron Antitrust Litig.*, Civil Action No. 03-cv-323, U.S.D.C., D.N.J.

5.      The law firm of Garwin, Gerstein & Fisher, LLP ("Garwin Gerstein") was lead or co-lead counsel in each of the cases listed in Paragraph 4 above.  Those cases resulted in extraordinary settlements with an aggregate value of $655 million.  As lead or co-lead counsel in those cases, Garwin Gerstein always acted in the Class's best interest and kept my Company apprised of the status of the litigation.  In all of my dealings with Garwin Gerstein, its attorneys have treated me with the utmost respect.

6.      I believe that Garwin Gerstein was the key force in effectuating the settlements of the actions listed in Paragraph 4 above.  I am confident in Garwin Gerstein's ability to

2

effectively lead in the prosecution of this litigation and trust them to act as a fiduciary for the class. I believe that Garwin Gerstein's participation in this action as lead counsel is in the Company's best interest.

7.    In consideration of the above and foregoing, The Company respectfully requests that the Court give due consideration to Garwin Gerstein's leadership in the management of this case.

I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief, this *15th* day of January, 2007.

Ken Couch

Sworn to and subscribed before me, Notary Public, on this *15* day of January, 2007.

Notary Public

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------X

LOUISIANA WHOLESALE DRUG CO., INC
     2085 I-49
     South Service Road
     Sunset, Louisiana 70584
on behalf of itself and all others similarly situated,

                                        Case No. 1:06-cv-02157-HJW
                                        Judge Richard W. Roberts

                   Plaintiffs,

               v.

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;
and ZENECA HOLDINGS, INC.,

                  Defendants.
---------------------------------------------------------------X

### AFFIDAVIT OF DICK MORAN

     I, Dick Moran, being duly sworn, depose and say, under penalty of perjury, the

following:

     1.     I am Vice-president/Chief Operating Officer of Value Drug Company (the

"Company").  I have the authority to execute this Affidavit on behalf of the Company.

     2.     Value Drug Company, founded in 1934 and incorporated in 1936, is an

independent wholesale drug distribution company, primarily serving the central Pennsylvania

area.

1

3.    The Company is a direct purchaser of Nexium from Defendants Astrazeneca Pharmaceuticals L.P.; Astrazeneca L.P.; Zeneca, Inc.; and Zeneca Holdings, Inc., and as such is a member of the putative class in the above captioned litigation.  In terms of dollar volume, Nexium is one of the top pharmaceutical products purchased by the Company.

4.    The Company has been a member of the direct purchaser class in other pharmaceutical antitrust cases including *In re Buspirone Antitrust Litig.*, MDL Docket No. 1410, U.S.D.C., S.D.N.Y.; *In re Cardizem CD Antitrust Litig.*, MDL Docket No. 1278, U.S.D.C., E.D.Mich.; *In re Relafen Antitrust Litig.*, Master File No. 01-12239, U.S.D.C., D.Mass.; *In re Terazosin Hydrochloride Antitrust Litig.*, MDL Docket No. 1317, U.S.D.C., S.D. Fla.; and *In re Remeron Antitrust Litig.*, Civil Action No. 03-cv-323, U.S.D.C., D.N.J.

5.    The law firm of Garwin, Gerstein & Fisher, LLP ("Garwin Gerstein") was lead or co-lead counsel in each of the cases listed in Paragraph 4 above.  Those cases resulted in extraordinary settlements with an aggregate value of $655 million.  As lead or co-lead counsel in those cases, Garwin Gerstein always acted in the Class's best interest and kept my Company apprised of the status of the litigation.  In all of my dealings with Garwin Gerstein, its attorneys have treated me with the utmost respect.

6.    I believe that Garwin Gerstein was the key force in effectuating the settlements of the actions listed in Paragraph 4 above.  I am confident in Garwin Gerstein's ability to effectively lead in the prosecution of this litigation and trust them to act as a fiduciary for the class.  I believe that Garwin Gerstein's participation in this action as lead counsel is in the

2

Company's best interest.

7.    In consideration of the above and foregoing, The Company respectfully requests that the Court give due consideration to Garwin Gerstein's leadership in the management of this case.

I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief, this 16th day of January, 2007.

> Value Drug Company
>
> *Dick Moran  V.P. / C.O.O.*
> Dick Moran, Vice-president/C.O.O.

Sworn to and subscribed before me, Notary Public, on this _16_ day of January, 2007.

*Renee' E. Hollen*
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Renee' E. Hollen, Notary Public
Allegheny Twp., Blair County
My Commission Expires April 27, 2008
Member, Pennsylvania Association of Notaries

# *RESUME OF*

# *GARWIN GERSTEIN & FISHER LLP*

Garwin Gerstein & Fisher LLP and its predecessor firms have successfully championed the rights of investors and consumers for over fifty years.  Garwin Gerstein & Fisher are well known around the United States for skill in representing investors, consumers, small businesses and the public in complex class action litigation involving such issues as:

- *The violation of investors' rights as a result of securities fraud or breaches of fiduciary duty;*

- *Antitrust violations, such as price-fixing and other anti-competitive practices;*

- *Unfair and deceptive trade practices;*

- *Deceptive insurance practices;*

- *Employment discrimination practices.*

Garwin Gerstein & Fisher has been general or trial counsel in class action and stockholder derivative lawsuits where we have generated outstanding results on behalf of our clients for over fifty years.

Set forth below are a few examples of cases which Garwin Gerstein & Fisher have prosecuted as lead or co-lead counsel over the past few years alone:

(a)    *In re Buspirone Antitrust Litigation,* MDL Docket No. 1413 (S.D.N.Y.) (Co-Lead Counsel).  Case was resolved after direct negotiation between our firm and counsel for the defendant for $220 million on behalf of a class of direct purchasers of Buspirone, *see*, 185 F.Supp. 2d 340 (S.D.N.Y. 2002) granting summary judgment against Bristol Myers with respect to certain patent infringement claims  *see also*, 208 F.R.D. 516 (S.D. N.Y. 2002) discussing issues of waiver of attorney client privilege with respect to matters placed at issue in the litigation.  *See also e.g.*, 185 F.Supp.2d 363 (S.D.N.Y. 2002); 210 F.R.D. 43 (S.D.N.Y. 2002)

(b)    *In re Relafen Antitrust Litigation,* Master File No. 01-12239-WGY (D. Mass.) (Co-Lead Counsel). Case was resolved on the eve of trial after direct negotiation between our firm and counsel for the defendant for $175 million on behalf of a class of direct purchasers of Relafen. District Court certified class of direct purchasers 218 F.R.D. 337 (D. Mass 2003) and denied defendants' motion for summary judgment.

(c)    *Butler et al. v. Provident Mutual Life Insurance Company*, January Term, 1999, No. 007801 (Court of Common Pleas-Philadelphia County), (Co-Lead Counsel) After expedited efforts led by our firm, we successfully preliminarily and permanently enjoined a transaction we argued would had denied Provident's policyholders any compensation for their ownership interests in Provident as part of a conversion of Provident to a Mutual Holding Company. After defeat of this proposal, at our urging, Provident then successfully sought a partner for a sponsored demutualization (Nationwide Financial Services) which delivered over $1 billion in compensation to Provident's eligible members.

(d)    *Sanders v. Wang, etc.*, Del. Ch., CA No. 16640, Steele, V.C. (November 8, 1999); (Co-Lead Counsel)  The Court of Chancery concluded that a Compensation Committee of the Board "exceeded their authority" under a stock option plan in awarding shares to inside directors/officers in granting  judgment on the pleading for plaintiffs on behalf of nominal defendant Computer Associates - settled for the return of in excess of $250 million in value of common stock for the Company. *See e.g.*, 1999 WL 1044880, 25 Del. J.Corp.L. 1036

(e)    *In re M&F Worldwide Corp. Shareholder Litigation*, Consolidated Civil Action No. 18502, V.C. Strine, (Co-Trial Counsel). After complete discovery and a two-week trial, the defendants agreed in 2002, to the complete relief sought by the plaintiffs - rescission of a complex series of transactions valued by defendants' own evidence at over $130 million

(f)    *In re Cardizem CD Antitrust Litigation* 200 F.R.D. 326 (E.D. Mich. 2001), (Co-Lead Counsel) Certifying class of direct purchasers of diltiazem; 105 F. Supp.2d 618 (E. D. Mich. District Court 2000) found Noerr-Pennington doctrine inapplicable and finding antitrust claim stated under both *per se* rule and rule of reason; granting partial summary judgment for violation of antitrust law. Case settled for $110 million in cash.

(g)    *In re Terazosin Hydrochloride Antitrust Litigation* 99-MDL-1317 (S.D.Fla.) (Co-Lead Counsel), recovered  $75 million for a class of direct purchasers of Terazosin Hydrochloride ("Hytrin") who were overcharged because of an illegal agreement between Abbott Laboratories, Zenith Pharms. Inc. (now known as Ivax Pharms., Inc.) and Geneva Pharms. Inc., which improperly delayed competition from generic versions of Hytrin; *see, e.g.,* 335 F.Supp 2d 1336 (S.D. Fla. 2004); 352 F. Supp. 2d 1279 (S.D. Fla. 2005); 344 F.3d 1294 (11th Cir. 2003)l 164 F. Supp. 1240 (S.D. Fla. 2001),

(h)     *In re Remeron Antitrust Litigation*, Case No. 2:02-cv-02007-FSH-PS (D.N.J.) (Co-Lead Counsel), recovered $75 million for a class of direct purchasers of mirtazapine who were overcharged because Organon USA, Inc. and Akzo Nobel, N.V. engaged in a scheme involving various illegal and deceptive acts to improperly extend Remeron's patent protection and market exclusivity, in violation of §2 of the Sherman Act.

(i)     *Gutter v. E.I. DuPont de Nemours, et al.*, Case No. 95-2152 (S.D. Fla.), (Lead Counsel) After over seven years of intensive litigation, after complete fact and expert discovery, this securities law violation case was settled in 2003 for $77.5 million in cash. *See e.g.*, 124 F.Supp.2d 1291 (S.D.Fla. 2000)

(j)     *In re Cendant Corporation Derivative Action Litigation*, 189 F.R.D. 117 (D.N.J. 1999), 232 F.Supp.2d 327 (D.N.J. 2002), (Lead Counsel) Court found, *inter alia,* demand excused where board implicated in failing to oversee alleged management financial fraud and Certificate of Incorporation liability exclusion for breach of fiduciary duty did not insulate directors – recovery of $54,000,000 for Cendant, and its shareholders.

(k)     *In re Nuveen Fund Litigation*, 1996 WL 347012, 1996 WL 328001, 1996 WL 328003, 1996 WL 328006, 1994 WL 505293, 1994 WL 505294 (N.D. Ill. 1996) (Lead Counsel) (a case addressing novel issues arising under the Investment Company Act and Minnesota Corporate law); *see also* 555 N.W. 2d 301 (MN App. 1996). – recovery of $24 million in cash for shareholders of certain Nuveen Funds.

(l)     *In re Northwest Airlines Corp. Antitrust Litigation*, 49 F.Supp.2d 553 (E.D. Mich. 1999), 197 F.Supp.2d 908 (E.D. Mich. 2002), 208 F.R.D. 174 (E.D.Mich. 2002), 310 F.3d 953 (6th Cir. 2002) (Lead Counsel) Successful withstanding a motion to dismiss a novel antitrust claim lodged against, *inter alia*, Northwest Airlines for "hidden cities" price ticketing practices and then successfully persuaded the District Court to certify a class of those impacted by "hidden cities" fares.

(m)     *In re USACafes, L.P. Litigation*, 600 A.2d. 43 (Del. Ch. 1991), (Lead Counsel) - - a case recognizing for the first time under Delaware law, a fiduciary duty owed by directors of a Delaware corporate general partnership to its Delaware limited partners.

(n)     *Zapata v. Maldonado*, 430 A.2d 779 (Del. Supr. 1981) (Lead Counsel) -- unquestionably one of the most important decisions in stockholder derivative litigation. The Delaware Supreme Court's decision halted a tidal wave of decisions that threatened to eliminate the derivative action as an effective barrier to corporate waste and mismanagement.

(o)     *Michelson v. Duncan*, 407 A.2d 211 (Del. Sup. 1979) (Lead Counsel) --a reversal in part of a dismissal of a derivative action predicated upon a shareholder ratification. The Delaware Supreme Court defined and reinstated plaintiff's waste cause of action.

(p)    *Stein v. Orloff*, Del. Ch., CA No. 7276, 11 Del. J. Corp. L. 312, 1985 WL 11561 Hartnett, V.C. (May 30, 1985) (Lead Counsel) - finding demand excused where plaintiffs stated a claim for waste of corporate assets by alleging properly "the consideration received by corporation was so inadequate that no person of ordinary sound business judgment would deem it worth what corporation paid."

(q)    *Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980) (Lead Counsel) --almost as important a decision as *Maldonado*, wherein Second Circuit reversed and remanded a business judgment dismissal of a derivative action. The Second Circuit's decision strongly intimated that business judgment could not be used to dismiss a well pleaded proxy claim, regardless of state law.

(r)    *Halpern v. Armstrong*, 491 F. Supp. 365 (S.D.N.Y. 1980) (Lead Counsel) -- an important Section 14(a) decision by Judge Milton Pollack wherein he found material proxy violations and thereby voided a number of transactions undertaken by Revlon, Inc., the corporation in question.

(s)    *Jacobs v. Adams*, 601 F.2d 176 (5th Cir. 1979) (Lead Counsel)--an important and total reversal of a district court's holding (1) that a New York executor may not prosecute a derivative action in Florida; and (2) that Florida law requires a plaintiff in a derivative action to make a demand on a corporation's shareholders before instituting suit.

## FIRM PARTNERS

**BRUCE E. GERSTEIN** graduated from Bernard M. Baruch College of The City University of New York in 1972 with a Bachelor of Business Administration with a major in public accounting, and is a Certified Public Accountant licensed in the State of New York (inactive). He graduated from Brooklyn Law School with honors in 1977. For the six years prior to joining the firm then known as Garwin & Bronzaft in January 1978, Mr. Gerstein was an investigatory accountant specializing in the area of stockholder's derivative and class actions. Mr. Gerstein is recognized as a leading attorney in complex litigation around the country resolving successfully antitrust, securities and consumer related class actions resulting in hundreds of millions of dollars for class members. Most recently, he was principally responsible for the negotiation of settlements of $110 million (Cardizem/Andrx), $220 million (Buspar/Bristol Myers) and $175 million (Relafen/Glaxo Smith Kline) representing direct purchasers of pharmaceutical products.

He has been named lead counsel in federal and state courts across the United States. He has lectured recently at conferences discussing important cutting edge antitrust issues in Florida and California, appearing most recently at a University of San Francisco symposium as a panelist with Herbert Hovenkamp, a leading authority and author of the seminal treatise on Antitrust law, discussing *inter alia*, issues arising out of the interplay between antitrust law, patent law and the Hatch Waxman Act.

Mr. Gerstein is admitted to practice in all of the Courts of the State of New York and the Court of Appeals for the First, Second, Third, Fifth, Seventh, Ninth and Eleventh Circuits. He is a member of the Association of the Bar of the City of New York and the New York County Lawyers' Association (the "NYCLA"), the Federal Bar Council and the Federal Courts Committee of the NYCLA.

**SCOTT W. FISHER** graduated from Rensselaer Polytechnic Institute in 1971 with a Bachelor of Science degree in Aeronautical Engineering. He received a Master of Arts in Mathematics Education in 1974 from Brooklyn College. Following his graduation from Rensselaer Polytechnic Institute, Mr. Fisher was an educator employed by the New York City Board of Education in a wide variety of pedagogical areas including curriculum development in mathematics.

Mr. Fisher graduated from Brooklyn Law School in 1982. Following his graduation from law school, he joined the firm then known as Garwin, Bronzaft & Gerstein, where he has worked on many major consumer class actions, stockholder class and derivative litigations. Mr. Fisher has been appointed lead or co-lead counsel in various securities litigations. Most recently Mr. Fisher served as co-trial counsel in Delaware Chancery Court in the *M&F Worldwide Corp. Shareholder Litigation*, Del. Ch. Consolidated C.A. No. 18502 NC (V.C. Strine) a case which resulted in a complete victory for M&F shareholders. He also had a prominent role in the pre-trial and trial proceedings of the fen/phen diet drug product liability class action tried before the Hon. Marina Corodemus in New Jersey Superior Court in 1999, which was resolved as part of a global resolution of diet drug cases for in excess of $4 billion.

Mr. Fisher has lectured recently at a Lorman sponsored conference on issues raised in connection with the settlement of class actions, including the use of mediation to facilitate settlement; and has appeared as a panel member at a New York State Bar Association conference discussing *inter alia*, class action practice from the plaintiff's perspective.

Mr. Fisher is admitted to the Bars of the State of New York and of the United States District Courts for the Southern and Eastern Districts of New York, the District of Arizona, the Eastern District of Michigan, the Courts of Appeal for the Second, Third, Seventh and Eleventh Circuits and the Supreme Court of the United States. Mr. Fisher is also a member of The Association of The Bar of The City of New York, American Trial Lawyers' Association and The New York State Bar Association.

**BARRY S. TAUS** graduated Cum Laude from the State University of New York at Albany in 1986 with a Bachelor of Science degree in Accounting.

Mr. Taus joined the firm then known as Garwin, Bronzaft, Gerstein & Fisher in 1988, where he has worked on numerous antitrust and stockholder class action and derivative litigations. He graduated from Brooklyn Law School in 1989.

Mr. Taus is admitted to the Bars of the State of New York and the United States District Court for the Southern District of New York. He is also a member of the Association of the Bar of the City of New York and the New York State Bar Association.

Mr. Taus is acting as Lead Counsel or Co-Lead Counsel in a number of major, complex antitrust litigations, including *In re Terazosin Hydrochloride Antitrust Litigation* (S.D. Fla.); *In re Ciprofloxacin Hydrochloride Antitrust Litigation* (E.D. N.Y.); and *In re K-Dur Antitrust Litigation* (D.N.J.) (Motion for Appointment as Co-Lead Counsel pending).

Mr. Taus had also taken a central, active role in many of the stockholder class actions and derivative actions in which his firm has been Lead Counsel (as detailed above), including *Rebenstock v. Fruehauf (Fruehauf Trailer); In Re Par Pharmaceutical Securities Litigation; and In Re F&M Distributors, Inc. Securities Litigation.*

**NOAH H. SILVERMAN** graduated from Grinnell College in 1986 with a Bachelor of Arts degree in Political Science.

Mr. Silverman graduated from Northwestern University School of Law in 1990 and has been with the firm since May 1991.

Mr. Silverman is admitted to the Bar of the State of New York and the United States District Court for the Southern and Eastern Districts of New York. He is a member of the Association of the Bar of the City of New York.

**BRETT H CEBULASH** graduated from the University of Virginia in 1984 with a Bachelor of Arts degree in Psychology.

Mr. Cebulash graduated cum laude from Brooklyn Law School in 1993 and has been with the firm since October 1993.

Mr. Cebulash is admitted to the Bar of the State of New York and the State of New Jersey and the United States District Court for the Southern and Eastern Districts of New York. He is a member of the Association of the Bar of the City of New York and the American Bar Association.

**JOSEPH OPPER** graduated from Tufts University in 1970 with a Bachelor of Arts in Political Science. He graduated from Hofstra University School of Law in 1975. From 1985 to 1996 Mr. Opper was a member of the Antitrust Bureau of the New York State Department of Law and served as the Acting Bureau Chief from 1994-96. Immediately, prior to joining the firm in 2000, he was employed by Milberg Weiss Bershad Hynes & Lerach LLP, where he specialized in

Antitrust and Human Rights litigation. From 1975-85 Mr. Opper practiced law at the Legal Aid Society in Brooklyn, New York.

Mr. Opper is a member of the New York Bar and is admitted to practice before the United States District Courts for the Southern and Eastern Districts of New York; United States Court of Appeals for the Second Circuit and United States Supreme Court.

*KEVIN S. LANDAU* graduated from Lehigh University in 1993 with a Bachelor of Arts degree in Government, with high honors.

Mr. Landau graduated from Brooklyn Law School in 1996, where he served on the Brooklyn Law Review. Mr. Landau has been employed by Garwin Gerstein & Fisher since September 1996.

Mr. Landau is admitted to the Bar of the State of New York and is a member of the New York State Bar Association.

*ADAM STEINFELD* graduated from Brandeis University in 1994 with a Bachelor of Arts degree in Political Science.

Mr. Steinfeld graduated from Brooklyn Law School in 1997, where he served on the Brooklyn Law Review. Mr. Steinfeld has been employed by Garwin Gerstein & Fisher since August, 1997.

Mr. Steinfeld is admitted to the Bars of the States of New York and Massachusetts.

## ASSOCIATES

*JAN BARTELLI* graduated from Syracuse University in 1993 with a Bachelor of Arts degree in English. She graduated from Brooklyn Law School in 1997, where she was a member of the Brooklyn Law Review and Moot Court. Prior to entering law school, Ms. Bartelli worked as a newspaper reporter for publications in New York City, New Jersey, and Connecticut. She has been employed by Garwin Gerstein & Fisher since January 1998.

Ms. Bartelli is admitted to the Bars of the States of New York and New Jersey.

*ARCHANA TAMOSHUNAS* graduated from Williams College in 1995 with a Bachelor of Arts degree in Political Science and Studio Art.

Ms. Tamoshunas graduated from New York University School of Law in 1999, where she was a member of the Moot Court Board. After graduating from law school, Ms. Tamoshunas was

employed by the City of New York, representing the City in Family Court. Ms. Tamoshunas has been employed by Garwin Gerstein & Fisher since October 2002.

Ms. Tamoshunas is admitted to the Bar of the State of New York, the United States District Courts for the Southern and Eastern Districts of New York, and is a member of the American Bar Association, The New York State Bar Association and the New York County Lawyers' Association.

***ANNE K. FORNECKER*** graduated magna cum laude from James Madison University in 1996 with a Bachelor of Arts degree in Sociology.

Ms Fornecker graduated cum laude from Brooklyn Law School in 2002, where she was a member of Brooklyn Law Review. Ms. Fornecker has been employed by Garwin Gerstein & Fisher since January 2003.

Ms. Fornecker is admitted to the Bar of the State of New York and the United States District Courts for the Southern and Eastern Districts of New York.

***KIMBERLY HENNINGS*** graduated *cum laude* from the University of Tampa in 2000 with a Bachelor of Science degree in Criminology.

Ms. Hennings graduated cum laude from Brooklyn Law School in 2003, and has been employed by Garwin Gerstein & Fisher since October 2003.

Ms. Hennings is admitted to the Bar of the State of New Jersey and is admitted to the Bar of the State of New York.

***ELENA K. CHAN*** graduated *cum laude* from Barnard College of Columbia University in 1997 with a Bachelor of Arts degrees in Political Science and East Asian Languages and Cultures.

Ms. Chan graduated *cum laude* from American University's Washington College of Law in 2004, where she was a Dean's Fellow and Student Attorney in the Glushko-Samuelson Intellectual Property Law Clinic. She has been employed by Garwin Gerstein & Fisher since March 2005.

Ms. Chan is admitted to the  Bars of the States of New York and New Jersey .

**ANNA L. TYDNIOUK** graduated *cum laude* from Odessa State University of Odessa, Ukraine in 1987 with a Master of Art degree in Linguistics.

Ms. Tydniouk graduated cum laude from Brooklyn Law School in 2005, and has been employed by Garwin Gerstein & Fisher since October 2005.

Ms. Tydniouk is admitted to the Bar of the State of New York.

Garwin Gerstein & Fisher or its predecessor firms, Garwin, Bronzaft, Gerstein & Fisher, Garwin, Bronzaft & Gerstein,  Garwin & Bronzaft  and Sidney L. Garwin, while acting as part of a team of lawyers has been actively involved in dozens of outstanding settlements over the past decades, including, without limitation *In re Diet Drugs Product Liability Litigation*, MDL 1203, *Vadino v. America Home Products Corp.*, Diet Drug Case Code #240; *In re Nasdaq Antitrust Litigation*; and *In re VMS Securities Litigation*.

In addition to those cases identified at pp 1-4 above, among the following cases our firm has

also resolved as either sole lead or co-lead counsel:

| **Title of Action** | **Approximate Amount of Benefits** |
|---|---|
| *Robert Cicarell, et al. v. Provident Mutual Life Insurance Company* (Court of Common Pleas) | $30 Million in life insurance policy benefits and $15 million cash |
| *In re Saloman Bros. Derivative Litigation* (S.D.N.Y.) | $40 Million |
| *In Re F&M Distributors, Inc. Securities Litigation* (E.D. Mich.) | $20.25 Million plus accrued interest |
| *In re Jiffy Lube Securities Litigation* (D. Md.) | $9.5 Million plus accrued interest |
| *Tabankin v. Kemper Short Term Global Income Fund* (N.D. Ill.) | $7.5 Million and other consideration valued in excess of $12.5 Million |
| *In re Mutual Savings Bank Securities Litigation* (E.D. Mich.) | $12 Million plus accrued interest |
| *Beaumont, et al. and Levine, et al. v. American Can* (N.Y. Supreme) | $10.5 Million plus accrued interest |
| *Rebenstock v. Fruehauf (Fruehauf Trailer Corp.) and Rebenstock v. DeLoitte & Touche* (E.D. Mich.) | $10.6 Million in cash and securities |
| *In Re RAC Mortgage Investment Corporation Securities Litigation* (D. Md.) | $12 Million plus accrued interest |
| *In Re Par Pharmaceutical Securities Litigation* (S.D.N.Y.) | $20 Million in cash and securities |

| | |
|---|---|
| *In Re Interco Incorporated Shareholders Litigation* (Del. Ch. Ct.) | $18.5 Million plus accrued interest |
| *In Re Revlon Group, Inc. Shareholders Litigation* (Del. Ch. Ct.) | $60 Million |
| *Goldberg v. Americana Hotels and Realty Corp., et al. (D. of Mass.)* | $9.46 Million plus accrued interest |
| *In Re: American Dental Laser, Inc. Securities Litigation* (E.D. Mich.) | $8 Million |
| *In re Buffets, Inc. Securities Litigation* (D. of Minn.) | $7 Million plus accrued interest |
| *In re GCA Corporation Securities Litigation* (D. of Mass) | $5.5 Million plus 1.15 million warrants |
| *In re American Southwest Mortgage Securities Litigation* (D. Of Ariz.) | $5.2 million |
| *In re Shared Medical Securities Litigation* (E.D. Pa.) | $5 Million plus accrued interest |
| *Wechsler v. Abramowitz, Del. Ch. Civil Action No. 6681 and 6862* (Del. Ch. Ct.) | Increased Going Private Price from $14.50 per share to $22.875 per share |

Currently Garwin Gerstein & Fisher LLP is either lead counsel, co-lead counsel or chairman of the Executive Committee in a number of complex class actions. Those cases include, *In re Merrill Lynch Focus Twenty Fund Investment Company Act Litigation,* pending in the Eastern District of New York; *Robert Corwin, derivatively on behalf of JDS Uniphase, Inc. v. Martin A. Kaplan, et al.*, pending in the Northern District of California; *Chase v. Northwest Airlines Corp. et al.*, 96-74711, pending in the United Stated District Court for the Eastern District of Michigan; *In re K-Dur Antitrust Litigation*, pending in the United States District Court for the District of New Jersey; *In Re Ciproflaxin Hydrochloride Antitrust Litigation*, pending in the United States District Court for the Eastern District of New York; *Louisiana Wholesale Drug Co. v. Becton Dickinson & Co., 05-CV-1602 (JLL)*, pending in the United States District Court for the District of New Jersey;

*In Re: Tricor Direct Purchaser Antitrust Litigation*, pending in the United States District Court for the District of Delaware; *In re OxyContin Antitrust Litigation*, pending in the United States District Court, Southern District of New York; *In re Neurontin Antitrust Litigation* -- MDL Docket No. 1479, pending in the United States District Court for the District of New Jersey.

UNITED STATES DISTRICT COURT


------------------------------------X
                                    :
IN RE:                              :   01-MD-1410
                                    :
        BUSPIRONE PATENT            :   April 11, 2003
                                    :
                                    :   500 Pearl Street
                                    :   New York, New York
------------------------------------X


     TRANSCRIPT OF CIVIL CAUSE FOR SETTLEMENT AND ATTORNEY'S FEES
             BEFORE THE HONORABLE JOHN G. KOELTL
                 UNITED STATES DISTRICT JUDGE



APPEARANCES:


For Bristol-Myers:              RICHARD STARK, ESQ.
                                LEE BICKLEY, ESQ.


For Louisiana Wholesalers:      BRUCE GERSTEIN, ESQ.
                                BRETT CEBULASH, ESQ.


For the Plaintiff States:       RICHARD SCHWARTZ, ESQ.


For Direct Purchaser Class:     RICHARD DRUBEL, ESQ.
                                KIMBERLY SCHULTZ, ESQ.
                                ERIC KRAMER, ESQ.


For the Defendants:             RICHARD STARK, ESQ.




Court Transcriber:              SHARI RIEMER
                                TypeWrite Word Processing Service
                                356 Eltingville Boulevard
                                Staten Island, New York 10312

41

1 Loadstar in a moment.

2        The fee of one-third falls within the range of rates
3 that have been approved in other class actions.  Determining
4 then whether the percentage fee is a reasonable fee in this
5 case applying the traditional standards it's clear for the
6 reasons that I already said in approving the settlement that
7 this is a very large and complex litigation.  There is always
8 risk involved in the litigation.  The fee that's being sought
9 is a completely contingent fee.  The case was taken on plainly
10 on a contingent fee basis and that is entitled to greater
11 weight than simply an hourly rate because the lawyers could
12 have walked away having done substantial work with no recovery.
13 This is not a case where the ground was substantially plowed
14 before.  While issues were raised with respect to the 365
15 patent, they remained to be litigated and there were
16 substantial issues which had to be decided in this case with
17 respect to whether there could be recovery over the allegations
18 relating to the 365 patent, and those were issues which had not
19 even -- have not been tested on appeal.

20        The Schein agreement was developed -- the arguments
21 with respect to the Schein agreement and recovery with respect
22 to the Schein agreement were developed completely in this case
23 so that the attorneys were able to establish a basis for
24 recovery which benefitted the class.  The quality of
25 representation was very high.  The case was vigorously
26 litigated on both sides and the quality of the lawyers in the

42

1  case was excellent.

2         The requested award in relationship to the
3  settlement, the plaintiff's counsel are correct that the
4  settlement is a very good settlement for the class.  It is a
5  high percentage of possible recovery for the class and the
6  percentage fee is within the range of reasonableness for other
7  contingent fees.  There is certainly a public policy favoring
8  the pursuit of anti-trust litigation on the part of consumers.

9         Looking at the Loadstar as a check on the one-third
10 requested contingent fee suggests that this fee is at the high
11 end because the relationship between the Loadstar and the fee
12 indicates a multiplier of 8.46 and plainly results in a very --
13 in a high hourly rate.  That is mitigated to some degree in the
14 case in my view because the case has settled before a
15 substantial amount of additional work has been done which would
16 have to be done if the case went forward to complete discovery,
17 substantive, motions, pretrial preparations and trial, to say
18 nothing of appeal.

19        During all of that period the number of hours spent
20 would have significantly increased.  So the Loadstar would have
21 gone up and the multiplier would have gone down.  Without any
22 reason to believe that the ultimate recovery would have been
23 any greater for the class and the use of the Loadstar has been
24 criticized in some cases as not being a very useful measure
25 because it encourages unproductive work and excessive hours
26 without any assurance that the results will be better for the

43

1   class -- I've looked at the rates and the hours and the rates

2   and the hours appear to be reasonable.  So that the beginning

3   Loadstar -- the beginning for the Loadstar calculation is a

4   wholly reasonable beginning and given the stage in the

5   litigation and the possibility that hours would have to be

6   substantially increased without any assurance that there would

7   be any additional money for the class leads to me think that

8   the Loadstar is less useful here as a measure of reasonableness

9   than the one-third contingent fee, which is what ultimately is

10  being sought, one-third fee to include expenses.

11          Ultimately, one of the most important factors in my

12  judgment as to the reasonableness of the fee is the reaction of

13  the class.  The defendant doesn't object to the fee, but of

14  course the defendant has no interest in the size of the fee in

15  this case because the settlement is a non-reversionary

16  settlement which has been put up by the defendant and whether

17  that amount of money goes to increase somewhat what the class

18  gets or increase somewhat what the class' lawyers get is of no

19  economic consequence to the defendant.  But the members of the

20  class have a significant interest in determining whether this

21  is a reasonable fee because any of the members of the class

22  could have come forward with objections to the size of the fee

23  and raised any of the issues with respect to the Loadstar or

24  the number of hours or the ultimate hourly rates for the

25  lawyers.

26          The class in this case is a relatively small class, a

44

1  sophisticated class represented by sophisticated lawyers who

2  with the best interests of their clients looked at the fee

3  request and made a determination not to object to the fee

4  request even though had there been an objection to the fee

5  request and the Court had to decide that request that amount of

6  money could have only benefitted the class.  But having looked

7  at all of the factors that go into account for determining the

8  reasonableness of a fee, the class decided not to raise any

9  objections to the fee.  So that is a very important factor in

10 assessing the reasonableness of the fee sought in this case.

11       So one reason that I go through this is it's a matter

12 of some concern that other fee requests in other cases get

13 cited back without any differentiation for what went on in the

14 fee applications in the individual cases.  It makes a

15 difference, for example, whether there is as plaintiff's

16 counsel pointed out a class of very small consumers who may not

17 have the incentive to and the wherewithal to be heard on the

18 issue of fees.  The nature of the class makes a difference.  In

19 Bucksbaum, which is also cited to me, there were sophisticated

20 investors who also could have been heard on the nature of the

21 fee.  That cautions against simply looking at the amounts

22 involved and the ranges involved in other cases in an

23 undifferentiated case in a undifferentiated way.

24       So looking at all of the factors in this case that

25 I've gone through at the end I will grant the fee request for a

26 one-third contingent fee and expense and the $25,000.00

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CARDIZEM CD ANTITRUST
LITIGATION,                                        Master File No. 99-md-1278
                                                  MDL No. 1278

THIS DOCUMENT RELATES TO:                         Honorable Nancy G. Edmunds

Louisiana Wholesale, 99-73259

Duane Reade, 99-73870
_____/

ORDER NO. 49

**MEMORANDUM OPINION GRANTING SHERMAN ACT CLASS PLAINTIFFS'
MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION,
AND SHERMAN ACT CLASS COUNSEL'S JOINT PETITION FOR ATTORNEYS'
FEES, REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR NAMED
PLAINTIFFS**

This matter came before the Court on November 20, 2002 on Sherman Act Class

Plaintiffs' motions for (1) final approval of settlement; (2) approval of plan of allocation; and

(3) Class Counsel's joint petition for attorneys' fees, reimbursement of expenses and

incentive awards for named Plaintiffs. The Court preliminarily approved the Settlement on

September 24, 2002. On November 20, 2002, a fairness hearing was conducted. For the

reasons stated below, this Court GRANTS Sherman Act Class Plaintiffs' motions.

I.    Background

Class Counsel filed class action suits on behalf of Plaintiffs and the Class on

November 18, 1998 and February 22, 1999. These suits were consolidated in this Court

by the Judicial Panel on Multidistrict Litigation on June 11, 1999. The Plaintiffs'

consolidated actions (the "Class Actions") arise out of Defendants' September 1997 Agreement, pursuant to which Aventis agreed to pay Andrx, *inter alia*, $10 million per quarter in return for Andrx's agreement not to manufacture and sell its generic version of Cardizem CD.  Plaintiffs have alleged that this Agreement kept less expensive generic versions of Cardizem CD off the market, thereby forcing direct purchasers to pay artificially inflated prices for Cardizem CD and its AB-rated generic equivalents.

On December 10, 1999, Class Counsel moved for certification of the Sherman Act Class.  After a period of class-related discovery, including expert depositions (and motion practice relating thereto), and briefing on Plaintiffs' motion, the Court conducted an evidentiary hearing and oral argument on class certification.  On March 14, 2001, the Court granted Class Counsel's motion allowing the litigation to proceed on a classwide basis and certified a class consisting of:

> all persons (or assignees of such persons) who at any time during the period July 9, 1998 through June 23, 1999 ("Class Period") directly purchased Cardizem CD from HMRI [now Aventis]; and who also, after the first generic version of Cardizem CD entered the market on June 23, 1999, either: (1) purchased one or more generic versions of Cardizem CD; or (2) obtained increased discounts for their direct purchases of Cardizem CD [the "Sherman Act Class" or "Class"].

*See* Order No. 24 at 3, 59.  Excluded from the Class are all Defendants in this lawsuit, and their officers, directors, management and employees, subsidiaries or affiliates.  *See id.* Also excluded are those direct purchasers who have already opted out of the Class on or before the opt-out deadline of January 25, 2002 ordered by the Court, including those who brought their own separate actions against Defendants, which are currently being coordinated with the Class's case before this Court.  Notice of the class certification decision was sent to Class members on or about December 11, 2001, pursuant to a notice

2

program approved by the Court. On March 28, 2001, Defendants filed a petition with the Sixth Circuit Court of Appeals for permission to appeal the Court's class certification ruling pursuant to Fed. R. Civ. P. 23(f). On June 18, 2001, the Court of Appeals denied Defendants' petition.

On December 10, 1999, Class Counsel also filed a motion for partial summary judgment asking the Court to rule that the Defendants' September 1997 Agreement was a *per se* violation of the antitrust laws. On February 8, 2000, Class Counsel argued the merits of the motion, and on June 6, 2000, the Court granted it, holding that the Defendants' agreement "constitutes a restraint of trade that has long been held illegal *per se* under established Supreme Court precedent." Order No. 13 at 1. On June 20, 2000, Defendants asked for permission to immediately appeal this decision to the Sixth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b). Defendants' request was granted, and on December 12, 2000, the Sixth Circuit agreed to hear Defendants' appeal. The appeal has been fully briefed and argued, and the parties are currently awaiting decision by the Sixth Circuit.

In December 1999, Defendants also moved to dismiss the consolidated complaint filed by the Plaintiffs. After substantial briefing and oral argument on these motions, the Court denied Defendants' motions to dismiss on May 11, 2000. *See* Order No. 12 at 4.

In addition to this significant motion practice, Class Counsel also conducted a coordinated and efficient discovery effort that included the filing of numerous motions to compel, the review of over a million pages of documents and conducting over 25 depositions of witnesses.

After lengthy negotiations, including a protracted mediation with Professor Eric Green, a highly experienced mediator approved by the Court, and following substantial discovery, investigation and substantive briefing on the legal issues, Class Counsel entered into a final settlement agreement and side letter with Defendants on August 13, 2002 (the "Settlement Agreement").

## II.    Analysis

### A. Final Approval of Settlement

Sherman Act Class Plaintiffs come before this Court seeking final approval, pursuant to Fed. R. Civ. P. 23(e) of the proposed settlement of this antitrust class action as embodied in the Settlement Agreement dated August 13, 2002 ("Settlement"). The Settlement provides for a cash payment of $110 million, plus interest (the "Settlement Fund") to the class certified by this Court on November 26, 2001. The Settlement comes after almost four years of vigorous litigation, including months of mediation under the aegis of the nationally recognized mediator, Professor Eric D. Green, in an extraordinarily complex case raising a multitude of difficult issues in the areas of antitrust law, patent law, and laws governing pharmaceutical drugs.

This Court preliminarily approved the proposed Settlement on September 24, 2002. It also approved the form and manner of notice for dissemination to the Class. Pursuant to the approved notice, all entities identified as potential Class members from Defendants' sales database were advised of their rights under the Settlement, including their right to exclude themselves from the Class, to object to any or all terms of the Settlement, the Plan of Allocation, the award of attorneys' fees and costs, and incentive awards to the named

4

Plaintiffs.  Copies of the Notice of Proposed Class Settlement and Hearing Regarding Settlement (the "Notice") were disseminated by first class mail to Class members, and a Summary Notice was published in two trade publications well known to entities within the pharmaceutical industry: the Pink Sheet and the Chain Drug Review.  The Summary Notice notified potential Class members of, *inter alia*, the proposed settlement and instructed them where to obtain a more detailed Class Notice.  The deadline for submitting objections was November 13, 2002. No Class members objected in writing or at the fairness hearing held on November 20, 2002.

### 1. Standards for Court Approval of Settlement

Fed. R. Civ. P. 23(e) provides that "[a] class action shall not be dismissed or compromised without approval of the court . . . ."  In deciding whether to approve a proposed class action settlement, the Court must determine, after the fairness hearing, whether the settlement is "fair, adequate, and reasonable, as well as consistent with the public interest."  *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir. 1990).  The Court's determination requires consideration of "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." Manual for Complex Litigation (Third) § 30.42 (1995).

Other relevant factors considered by the Court include: (1) the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (2) the risks, expense, and delay of further litigation; (3) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (4) the amount of discovery completed and the character of the evidence uncovered; (5) whether the

settlement is fair to the unnamed class members; (6) whether the settlement is consistent with the public interest; (7) objections raised by class members; and (8) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining. *See Granada Investments, Inc. v. DWG* Corp., 962 F.2d 1203, 1205 (6th Cir. 1992); Williams *v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983); *Kogan v. AIMCO Fox Chase*, L.P., 193 F.R.D. 496, 501-02 (E.D. Mich. 2000); *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 305-06 (E.D. Mich. 1988).

## 2. Evaluation of the Settlement Under Applicable Standards

Considering the above, this Court finds that the proposed Settlement is fair, adequate, and reasonable. Accordingly, Plaintiffs' motion is GRANTED, and the Settlement is APPROVED for the following reasons.

### a. The Benefits of the Settlement Weigh in Favor of Approval

Pursuant to the proposed Settlement, the Class will obtain an immediate and certain benefit of $110 million in cash, plus interest ($539,116.96 as of October 31, 2002). The Sherman Act Class Plaintiffs' expert economist has estimated that this amount represents more than 200% of the total amount the Class was overcharged during the period the Defendants' September 1997 Agreement was in effect (September 24, 1997 through June 9, 1999), and more than 95% of overcharge damages accrued through August 13, 2002, the date the Sherman Act Class Plaintiffs and Defendants signed the proposed Settlement Agreement.[1] The recovery to the Class under the negotiated Settlement is well beyond the

---

[1]The Settlement Agreement also provides "most favored nation" protection against a settlement with any other direct private purchaser on better monetary terms for a comparable release than the Settlement with the Class. If Defendants were to enter into such a settlement, additional payments on behalf of the Class would be required to make

percentage of claimed damages found by other courts to be satisfactory. *See In re Warfarin Sodium Antitrust Litig.*, ___ F. Supp.2d ___, ___, 2002 WL 2007850, *26 (D. Del. Aug. 30, 2002) (observing that "[t]he settlement amount of $44.5 million represents more than 33% of the maximum possible recovery," and finding that this is "a very reasonable settlement when compared with recovery percentages in other class actions."). In light of the above, this Court finds that the benefits the Settlement confers on the Class weigh in favor of approval.

### b. The Risks, Expenses, and Delay of Continued Litigation Favor Approval

As part of the approval process, the Court also evaluates the proposed Settlement's fairness and adequacy "by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Williams*, 720 F.2d at 922. Settlements should represent "a compromise which has been reached after the risks, expense and delay of further litigation have been assessed." *Id.* Accordingly, this Court examines the risks, expense, and delay Plaintiffs would face if they continued to prosecute this complex litigation through trial and appeal and weighs those factors against the amount of recovery provided to the Class in the proposed Settlement.

The prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery. Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict. Moreover, Plaintiffs', while

---

up the difference. *See* Settlement Agreement ¶ 7. The mediator, Eric Green, has already determined that the Individual Sherman Act Plaintiffs' settlement with Defendant Aventis does not trigger Aventis' obligation to make additional payments to the Class under this "most favored nation" clause.

emphasizing the strengths of their case, candidly admit there were hurdles that would have to be overcome for successful prosecution at trial and on appeal.

First, there is the risk that the Sixth Circuit might reverse this Court's ruling that Defendants' September 1997 Agreement was a *per se* violation of the Sherman Act. This issue is pending on appeal, and, if reversed, would add significantly to the risks Plaintiffs would face at trial. For example, Plaintiffs would have to prove their case under a more difficult "quick look" or "rule of reason" analysis. They would also have to rebut Defendants' pro-competitive justifications for the Agreement and define a relevant market.

Second, Plaintiffs faced risks regarding the causation element of their claims. The FTC, in its "Analysis to Aid Public Comment" accompanying the announcement of its settlement with Defendants, stated that, based on its investigation, it did not believe that the Defendants' September 1997 Agreement delayed the entry of Andrx's generic Cardizem CD product onto the market. Sherman Act Class counsel disagree with this statement and observe that it has no precedential value. Nonetheless, they acknowledge that it highlights one of the primary risks Plaintiffs would face absent the Settlement. During the course of this litigation, Defendants have vigorously challenged Plaintiffs' claims with multi-faceted and complex causation arguments; i.e., that, regardless of the September 1997 Agreement, Andrx had no intention of coming to market while its patent litigation with Aventis (formerly HMRI) was pending, and furthermore, Andrx could not have come to market any earlier due to various financial and technical reasons. Class Counsel contend that they developed persuasive evidence to refute these defenses (and thus obtained a favorable settlement) but cannot dismiss the fact that there is no way to assure that they would have succeeded on their claims if they had proceeded to trial.

8

If the jury came to the conclusion that the Defendants' September 1997 Agreement did not delay Andrx (or any other generic company) from entering the market, then the Class would recover nothing – even if the Court's ruling that the Agreement was a *per se* violation of Section 1 of the Sherman Act is upheld on appeal.  To recover monetary damages under Section 4 of the Clayton Act, the Class must not only establish that Defendants' September 1997 Agreement was illegal but also that it caused the Class economic harm.  Here, the economic harm claimed by the Class is overcharges incurred because of the alleged delay in generic entry caused by the Defendants' September 1997 Agreement.  Accordingly, a jury's determination that the Agreement did not delay generic entry would result in no recovery for the Class.  Plaintiffs would also likely face additional defenses at trial; i.e., that Class members, especially wholesalers, did not suffer any economic injury as a result of the Agreement ("bypass" argument raised by Defendants in the class certification context).  The possibility that a jury could agree with Defendants at trial on any of these issues presents a risk to be weighed against the amount and form of relief offered in the settlement.

Continued prosecution through trial and appeal would also create substantial additional expense and delay.  Although significant discovery has already taken place (Class counsel contends that it has already reviewed approximately one million documents and taken numerous depositions), substantial additional effort and expense would be required to prepare this matter for trial.  This would include: (1) completion of fact and expert discovery; (2) preparing witnesses, experts and exhibits; and (3) completing pre-trial motion practice, including possible motions for summary judgment.

In light of the above, this Court finds that the certain and immediate benefits to the Class represented by the Settlement outweigh the possibility of obtaining a better result at trial, particularly when factoring in the additional expense and long delay inherent in prosecuting this complex litigation through trial and appeal.

### c. The Judgment of Experienced Counsel and the Amount and Character of Discovery Weigh in Favor of Approval

In approving a proposed Settlement, the Court also considers the opinion of experienced counsel as to the merits of the settlement. As the Sixth Circuit observed, "[t]he court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs. Significantly, however, the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered." *Williams*, 720 F.2d at 922-23 (internal citations omitted).

This Court finds that counsel for the Sherman Act Class, who have extensive experience in antitrust and other complex class action litigation, negotiated the proposed settlement at arm's length, after extensive discovery and independent analysis of all relevant matters, and thus it defers to Class Counsel's conclusion that the proposed Settlement is fair, adequate, and reasonable. At the time the parties entered into the Settlement Agreement, fact discovery relevant to the Sherman Act Class Plaintiffs' action had almost been completed. Class Counsel's Affidavits reveal that they had (1) thoroughly investigated the claims against Defendants; (2) retained and worked with expert witnesses in evaluating aggregate damages to the Class and Defendants' highly technical production-related causation defenses; and (3) sufficiently developed the facts concerning

Defendants' liability and damages to make a highly informed decision regarding the proposed Settlement. All of this weighs in favor of the Court's approval of the Settlement.

### d. The Fact that the Settlement Is the Product of Arm's Length Negotiations as Opposed to Collusive Bargaining and Consideration of the Fairness of the Settlement to the Unnamed Members of the Class Also Favor Approval

This Settlement comes after almost four years of vigorous litigation and is the product of arm's length settlement negotiations between Class Counsel and Defendants that lasted several months. These negotiations and the ultimate Settlement Agreement were closely monitored by Professor Eric D. Green, an experienced and respected mediator. He opines in his Mediation Report to the Court that "this settlement was the result of hard-fought and difficult negotiations. All counsel did an excellent job in the litigation and the mediation, and in my opinion the process was such as would lead to a fair and reasonable settlement." Eric Green 11/18/02 Mediation Report at 4.

As to the Settlement's fairness to unnamed members of the Class, Plaintiffs' expert economist estimates that the $110 million Settlement (plus interest) is more than enough to cover all of the Class's overcharge damages. Moreover, pursuant to the proposed Plan of Allocation, the Settlement Fund is to be distributed *pro rata* to all Class members based on their proportion of the Class's aggregate damages. The fact that the two named Plaintiffs are to receive an incentive award in the amount of $20,000 does not render the Settlement unfair to unnamed members of the Class. In light of the above, this Court finds that the Settlement was negotiated at arm's length and would be fair to the unnamed Class members. Accordingly, these factors also weigh in favor of approval.

11

### e.  The Settlement's Consistency with Public Interest Favors Approval

There is a strong public interest in private antitrust litigation. *See e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983).  Likewise, there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are "notoriously difficult and unpredictable" and settlement conserves judicial resources. *See Granda*, 962 F.2d at 1205 (internal quotes and citation omitted). *Accord, In re Warfarin Sodium Antitrust Litig.*, ___ F.Supp.2d at ___, 2002 WL 2007850 at *21; *Steiner*, 121 F.R.D. at 305.  Settlement of this antitrust action serves the public interest by ensuring effective enforcement of the antitrust laws and deterrence of anti-competitive conduct in the marketplace. *See Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318 (1965).  This is particularly important in the pharmaceutical industry where the potential harm to society caused by agreements to prevent or delay entry of cheaper generic products has recently received considerable attention.

### f.  The Lack of Class Member Objections Weighs Heavily in Favor of Approval

Notice of the Settlement included a description of the Class, the procedural status of the litigation, description of the Class members' rights under Fed. R. Civ. P. 23(b)(3), the significant terms of the Settlement, a general description of the proposed plan of allocation of the settlement proceeds, and a description of the process of court approval.  Notice was mailed to each Class member at its last known address (for whom such address was known).  The Summary Notice was also published in two industry publications, and the Settlement Agreement and Notices were posted on the websites of Co-Lead Counsel.  No Class member objected to the terms of the Settlement in writing or at the fairness hearing

12

held on November 20, 2002. The Court finds that the positive Class response to the proposed Settlement weighs heavily in support of its approval. *See Kogan*, 193 F.R.D. at 502.

### 3. Conclusion

Having considered the above factors, this Court finds that the proposed Settlement merits FINAL APPROVAL. For the reasons stated on the record at the November 20, 2002 fairness hearing, this Court's approval is without prejudice to the Individual Sherman Act Plaintiffs' right to assert arguments against application of the release language contained in the Settlement Agreement to the claims asserted in their separate, on-going litigation.[2] Defendant Andrx's arguments regarding the legal effect of that release language present affirmative defenses that are properly considered in the context of that separate, on-going litigation. *See Abbott Labs. v. CVS Pharmacy, Inc.*, 290 F.3d 854 (7th Cir. 2002).

### B. Approval of Allocation Plan

Sherman Act Class Plaintiffs also seek approval of their Plan of Allocation which allocates the settlement funds, net of Court-approved attorneys' fees, incentive awards, and expenses ("Net Settlement Fund"), in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged anti-competitive conduct. For the following reasons, this Court GRANTS Plaintiffs' motion and APPROVES Plaintiffs' Plan of Allocation.

---

[2]As clarified at the November 20, 2002 fairness hearing, Individual Sherman Act Plaintiffs have no objection to this Court's approval of the proposed Settlement in this action.

13

First, no Class member has objected to the Plan. Second, it provides a fair and reasonable method of calculating Class member overcharge damages based on each Class member's actual purchases of generic Cardizem CD and/or any increased discounts on Cardizem CD that the Class members actually received, in conformance with Plaintiffs' experts' damage calculation methodology; and also provides a fair and reasonable method for determining each Class member's *pro rata* share of the Net Settlement Fund.

Third, the Plan adequately describes: (1) the method of calculating each Class member's overcharge damages and *pro rata* share of the Net Settlement Fund; (2) the contents and method of disseminating a Claims Notice form; (3) the manner in which claims will be initially reviewed and processed; (4) the method of notifying Class members of the amount that each Class member will receive from the Net Settlement Fund ("Notice of Class Member Distribution Amount"); and (5) the process for handling and resolving challenged claims. It also includes deadlines for completing tasks related to distributing each Class member's *pro rata* share of the Net Settlement Fund: (1) preparation and dissemination of the Claims Notice form; (2) receipt by the Settlement Administrator of completed Claims Notice forms and supporting documentation; (3) curing deficiencies in any Claims Notice form or supporting documentation submitted by Class members; (4) disseminating the Notice of Class Member Distribution Amount; and (5) challenging and resolving disputes over the Settlement Administrator's determination of each Class member's distribution amount.

Accordingly, Plaintiffs' Plan of Allocation is approved with one minor amendment. Consistent with Paragraph 23 of the parties' Settlement Agreement, the term "alleged" (or, where appropriate, "allegedly") shall be inserted in the Plan at page 2 (before references

14

to "the illegal Agreement," "the illegal behavior" and "the collusive period"), page 3 (before reference to "the anti-competitive Agreement"), page 4 (before reference to "delay[ed] generic entry [and] delayed competition"), and page 9 n.5 (before reference to "the collusive conduct").

## C. Approval of Requested Attorneys' Fees, Expenses and Incentive Awards

Class Counsel also filed a Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards for Named Plaintiffs. Specifically, Class Counsel request a fee in the amount of 30% of the Settlement Fund plus interest, for a total of $33,161,734.80 through October 31, 2002, plus 30% of additional interest as accrued. Counsel for the Sherman Act Class also request reimbursement of $1,089,371.73 in out-of-pocket expenses incurred in the representation of the Sherman Act Class. Finally, Class Counsel request an incentive award of $20,000 each to the named Plaintiffs, Louisiana Wholesale Drug Company, Inc. and Duane Reade, Inc., for their participation as representatives of the Sherman Act Class. For the reasons set forth below, this Court GRANTS Class Counsel's requests.

### 1. Attorneys' Fees

The Class members' claims against Defendants in this consolidated action have been settled for $110 million in cash, plus interest since July 1, 2002 (as of October 31, 2002, $539,116.96 of interest has accrued). As discussed above, this represents an excellent settlement for the Class and reflects the outstanding effort on the part of highly experienced, skilled, and hard working Class Counsel. As Class Counsel's affidavits show, their efforts were not only successful, but were highly organized and efficient in addressing

numerous complex issues raised in this litigation, including highly technical Federal Drug Administration ("FDA") regulatory issues, patent, manufacturing, financial and related causation issues. To date, Class Counsel have been without compensation of any kind. They have expended more than 27,000 hours over a four-year period, with compensation wholly contingent on the result achieved.

This Court finds that the percentage-of-the-fund method is the proper method for compensating Class Counsel, and that an attorneys' fee award of 30% of the Settlement Fund is reasonable under the circumstances presented here. Courts in the Sixth Circuit have approved similar percentage awards, and consideration of factors identified by the Sixth Circuit justify such an award.

The Settlement Fund is a "common fund", and the courts have long recognized that a lawyer who recovers such a fund is entitled to a reasonable attorneys' fee from the fund as a whole. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "In a common fund case, the 'fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant.'" *Fournier v. PFS Investments, Inc.*, 997 F. Supp. 828, 830 (E.D. Mich. 1998) (quoting *Court Awarded Attorneys Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 250 (1985)). "The common fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment. It applies where a common fund has been created by the efforts of plaintiffs' attorney and rests on the principle that persons who

16

obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." Manual for Complex Litigation (Third) § 24.121 (1995) (internal quotes and footnotes omitted).

The Sixth Circuit leaves it to the Court's discretion as to whether it will apply the lodestar or percentage-of-the-fund method to awards of attorneys fees, requiring "only that awards of attorney's fees by federal courts in common fund cases be reasonable under the circumstances." *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). It noted, however, that the recent trend has been towards application of a percentage-of-the-fund method in common fund cases. *See id.* Courts within the Sixth Circuit have likewise indicated their preference for the percentage-of-the-fund method. *See, e.g., In re F & M Distributors, Inc. Sec. Litig.*, Case No. 95-CV-71778-DT, 1999 U.S. Dist. LEXIS 11090, [1999 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 90,621 (E.D. Mich. June 29, 1999) (choosing percentage-of-the-fund as the better method for determining attorneys' fees in a securities class action); *In re Rio Hair Naturalizer Products Liability Litig.*, MDL No. 1055, 1996 U.S. Dist. LEXIS 20440 (E.D. Mich. Dec. 20, 1996) (observing that "more commonly, fee awards in common fund cases are calculated as a percentage of the fund created, typically ranging from 20 to 50 percent of the fund"); *Fournier*, 997 F. Supp. at 832-33 (choosing percentage-of-the-fund method in class action securities litigation). This Court agrees with Judge Cook's observations in *F & M Distributors* that (1) "the lodestar method is too cumbersome and time-consuming of the resources of the Court"; and (2) "more importantly, the 'percentage of the fund' approach more accurately reflects the result achieved." 1999 U.S. Dist. LEXIS 11090 at *8 (internal quotes and

citations omitted). This Court's decision to apply the percentage-of-the-fund method is consistent with the majority trend, and, more importantly, is reasonable under the circumstances presented here.

As the Third Circuit Task Force recently concluded, "[m]ost courts use the percentage of the fund method." *Third Circuit Task Force on the Selection of Class Counsel*, Final Report of the Third Circuit Task Force at 103 (January 2002). The Task Force concluded that "[a] percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel." *Id.* at 19. It explained why the lodestar method is inferior to the percentage fee approach:

> The lodestar remains difficult and burdensome to apply, and it positively encourages counsel to run up the bill, expending hours that are of no benefit to the class. Moreover, use of the lodestar may result in undercompensation of talented attorneys. Experienced practitioners know that a highly qualified and dedicated attorney may do more for a class in an hour than another attorney could do in ten. The lodestar can end up prejudicing lawyers who are more efficient with a less expenditure of time.

*Id.* at 104. These observations apply here. The percentage fee method is preferred so as not to undercompensate extremely talented and efficient Class Counsel.

This Court also finds that the requested 30% fee is fair and reasonable and is justified by the excellent performance of Class Counsel in obtaining an extraordinary result for the Class in this complex litigation. This is within the ordinary range of between 20-30% typically awarded in common fund cases. *See F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *8-10 (awarding 30% of the gross settlement fund after reviewing other awards in the Sixth Circuit and finding 30% award consistent with the trend). It is also within the range of fee awards in settlements with common funds of comparable size to the $110

18

million Settlement Fund at issue here. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.4 (9th Cir.) (upholding a 28% fee award of a $96.885 million settlement fund, and observing that its survey of percentage fee awards "from 34 common fund settlements of $50-200 million from 1996-2001," show a majority clustered in the 20-30% range), *cert. denied*, ___ S. Ct. ___, 2002 WL 1968819, 71 U.S.L.W. 3154 (U.S. Nov. 12, 2002).

A lower percentage is not required simply because the Settlement obtained on behalf of the Class is large. As recently observed by the District Court for the Southern District of New York, blind adherence to a declining percentage-of-fund method under these circumstances "can create an incentive to settle quickly and cheaply when the returns to effort are highest," and can create an undesirable situation where counsel is inadequately rewarded for "investing additional time and maximizing plaintiffs' recovery." *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D. N.Y. 2000).

This Court determines the reasonableness of the percentage requested by Class Counsel by examining factors identified by the Sixth Circuit. These include: "(1) the value of the benefit rendered to the plaintiff class . . .; (2) the value of services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) (internal quotes and citations omitted). *Accord, Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983).

Considering the above factors, this Court finds that Class Counsel's requested fee award is reasonable under the circumstances. First, as discussed above, the result Class Counsel obtained on behalf of the Class is extraordinary. Second, there is no question that Class Counsel spent thousands of hours litigating this complex case over the past four years. Their work at all times has been of the highest quality. The Court is also mindful that the significant amount of time spent on this action precluded Class Counsel from working on other matters. Moreover, the fact that the 30% fee recovery in this case would equate to a lodestar multiplier of approximately 3.7 does not render it unreasonable. Similar multipliers have been accepted as fair and reasonable in complex matters with large settlement funds such as this. See Vizcaino, 290 F.3d at 1051 (examining cases and determining that a 3.65 multiplier on a $96.885 million settlement was appropriate and within the range applied in large common fund cases).

The third through sixth factors also support the requested attorneys' fee. Class Counsel undertook representation of the Class on a contingent fee basis and thus bore the risk of recovery (detailed above) and the outlay of large out-of-pocket expenses for almost four years. The complexity of this case cannot be overstated. Antitrust class actions are inherently complex. The complexity of this antitrust case was enhanced by additional, highly technical, causation-related issues; i.e., regulatory issues arising out of the Hatch-Waxman Act; patent law issues relevant to the Aventis/Andrx patent litigation underlying the Defendants' September 1997 Agreement; the intricacies of the pharmaceutical industry from a sales and marketing perspective; the scientific and production processes involved with inventing and commercializing branded and generic pharmaceutical products; and the FDA regulations applicable to reviewing and approving pharmaceutical products and new

manufacturing facilities/processes.  Despite its complexity, Class Counsel was able to efficiently and effectively prosecute and settle this matter.  A review of Class Counsel's affidavits, submitted in support of the petition, reveals that they were able to streamline and focus their discovery and litigation efforts through standing weekly conference calls in which tasks were assigned and reviewed and through discovery agendas where the internal discovery committee was required to justify the need for each piece of discovery before pursuing it.

Furthermore, this Court would be remiss if it failed to acknowledge the experience, hard work, and skill demonstrated by Class Counsel in this matter.  Their excellent performance on behalf of the Class in this hotly contested case justifies the award they seek.  The Court is appreciative of the professionalism, skill, and competency displayed by counsel for both sides throughout this litigation.  Professor Eric Green, the mediator in this matter, likewise observed that the skill and professionalism of counsel for the Defendants and the Plaintiff Class during the mediation was of the highest caliber.

Finally, this Court considers society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others.  As already noted, Class Counsel obtained an excellent settlement for the Class in a complex and hard-fought case. "Society's stake in rewarding attorneys who can produce such benefits in complex litigation such as in the case at bar counsels in favor of a generous fee. . . ." *F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *18.  Society also benefits from the prosecution and settlement of private antitrust litigation.  *See e.g., Pillsbury Co.*, 459 U.S. at 262-63; *Minnesota Mining & Mfg. Co.*, 381 U.S. at 318. Class Counsel brought this private antitrust action seeking to enforce the antitrust laws and alleging that a brand-name drug

manufacturer had colluded with a generic competitor to block cheaper generic versions of the brand-name drug from coming to market. This case has helped put prescription drug pricing and marketing tactics at the forefront of media, Congressional scrutiny, and judicial scrutiny. Encouraging qualified counsel to bring inherently difficult and risky but beneficial class actions like this case benefits society.

Taking into consideration the above factors and also observing that there are no objections to the requested fee, this Court awards counsel for the Sherman Act Class 30% of the Settlement Fund plus interest, for a total of $33,161,734.80 through October 31, 2002, plus 30% of additional interest as accrued.

## 2. Reimbursement of Expenses

In addition to their petition for attorneys' fees, Class Counsel seek reimbursement of $1,089,371.73 in out-of-pocket expenses incurred in the representation of the Sherman Act Class. Upon review of the numerous affidavits submitted by Class Counsel in support of this request, the Court finds this amount to be fair and reasonable. "Expense awards are customary when litigants have created a common settlement fund for the benefit of a class." *F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *19. In determining whether the requested expenses are compensable in this common fund, the Court has considered whether the particular costs are of the type typically billed by attorneys to paying clients in similar cases. *See In re Synthroid Marketing Litig.*, 264 F.3d 712, 722 (7th Cir. 2001). The Court finds that the categories of expenses for which Class Counsel seek reimbursement are the type routinely charged to their hourly fee-paying clients and thus should be reimbursed out of the Settlement Fund. Likewise, considering the detailed affidavits

22

submitted in support of the request for reimbursement, this Court is persuaded the these expenses are reasonable.

### 3. Incentive Awards to Named Plaintiffs

Finally, Class Counsel request the Court to approve incentive awards in the amount of $20,000 each for the two named Plaintiffs, Louisiana Wholesale Drug Company, Inc. and Duane Reade, Inc. The Court GRANTS Class Counsel's request. Such awards are also common in class actions such as this. *See F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *20. The Notice to the Class advised that Class Counsel would apply for these incentive awards, and no objections were received. Moreover, the Court finds these incentive awards to be reasonable and justified in light of the discovery, mediation, settlement, and other litigation burdens placed on Louisiana Wholesale and Duane Reade, Inc.

## III.   Conclusion

For the foregoing reasons, this Court GRANTS Sherman Act Class Plaintiffs' motions for (1) final approval of settlement; (2) approval of plan of allocation; and (3) Class Counsel's joint petition for attorneys' fees, reimbursement of expenses and incentive awards for named Plaintiffs.

Nancy G. Edmunds
U.S. District Judge

Dated: 2 6 NOV 2002

23

## CERTIFICATE OF SERVICE

**Pursuant to Rule 77(d), Federal Rules of Civil Procedure, copies have been mailed to:**

Elwood S. Simon, Esq.
**ELWOOD S. SIMON & ASSOCIATES**
355 South Old Woodward Avenue
Suite 250
Birmingham, MI 48009

Stephen Lowey, Esq.
**LOWEY, DANNENBERG,**
 **BEMPORAD & SELINGER PC**
The Gateway, 11th Floor
One North Lexington Avenue
White Plains, New York 10601-1714

Joseph J. Tabacco, Jr., Esq.
**BERMAN, DEVALERIO, PEASE & TABACCO**
425 California Street, Suite 2025
San Francisco, CA 94104

Richard Drubel, Esq.
**BOIES & SCHILLER**
26 South Main Street
Hanover, NH 03755

Bruce E. Gerstein, Esq.
**GARWIN BRONZAFT GERSTEIN & FISHER, LLP**
1501 Broadway
New York, NY 10036

Scott E. Perwin, Esq.
**KENNY NACHWALTER SEYMOUR ARNOLD**
 **CRITCHLOW & SPECTOR, PA**
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4327

Joseph Rebein, Esq.
**SHOOK, HARDY & BACON LLP**
One Kansas City Place
1200 Main Street
Kansas City, MO 64105

Craig L. John, Esq.
**DYKEMA GOSSETT PLLC**
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304-5086

Louis M. Solomon, Esq.
**SOLOMON ZAUDERER ELLENHORN**
 **FRISCHER & SHARP**
45 Rockefeller Plaza
New York, NY 10111

Norman C. Ankers, Esq.
**HONIGMAN MILLER SCHWARTZ & COHEN**
32270 Telegraph Road, Suite 225
Bingham Farms, MI 48025-2457

Steve D. Shadowen
**SCHNADER HARRISON SEGAL & LEWIS, L.L.P.**
Suite 700, 30 North Third Street
Harrisburg, PA 17101-1713

Paul F. Novak
Assistant Attorney General
**CONSUMER PROTECTION DIVISION**
670 G Mennen Williams Building
Lansing, MI 48913

Robert Hubbard
**OFFICE OF THE NEW YORK ATTORNEY GENERAL**
120 Broadway
New York, NY 10271-0332

David L. Douglas
**PORTER WRIGHT MORRIS & ARTHUR**
1919 Pennsylvania Avenue N.W.
Washington, DC 20006-3434

**JUDICIAL PANEL MULTIDISTRICT LITIGATION**
Thurgood Marshall Federal Judiciary Building
Room G-255 North
One Columbus Circle, N.E.
Washington, D.C. 20002-8004

_____
Deputy Court Clerk

2 6 NOV 2002
_____
Date

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 1:02CV0844 |
| | : | |
| **SCRAP METAL ANTITRUST** | : | **JUDGE O'MALLEY** |
| **LITIGATION** : | | |
| | : | |
| | : | **MEMORANDUM & ORDER** |
| | : | |

As series of putative antitrust class actions have been transferred to and consolidated before this Court. It is now incumbent upon the Court to establish procedures for the pre-trial management of those cases.

At a hearing on Wednesday, July 24, 2002, alternative case management plans were presented by Plaintiffs' counsel. Counsel for Bic Manufacturing and Talan Products, Inc. submitted a proposal whereby the Court would appoint John R. Climaco of Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A. as lead counsel and would create an executive committee consisting of lead counsel and two attorneys from each of the four consolidated cases.[1] Counsel for Profile Grinding, Inc., The Lincoln

---

[1] In its original proposal, the executive committee would have been comprised of two attorneys from only three of the consolidated cases. This proposal, however, was submitted to the Court prior to the filing of the fourth case that has been consolidated. Thus, the Court construes this proposal also to encompass two attorneys from this later-filed case.

Electric Co., and Shiloh Industries, Inc. also submitted a proposal whereby the law firms of Boies, Schiller

& Flexner, LLP and Scott & Scott, LLC would serve as co-lead counsel and the firm of McDonald,

Hopkins, Burke & Haber Co., L.P.A. would serve as liaison counsel.  Although counsel for Midwest

Materials did not submit a proposal prior to the hearing, it joined Profile Grinding, Lincoln Electric, and

Shiloh Industries in recommending the appointment of Boies, Schiller and Scott & Scott as co-lead counsel.

The Manual for Complex Litigation, Third (1995), recommends the appointment of lead counsel

to coordinate the prosecution of complex class actions.  Lead counsel has the "major responsibility for

formulating (after consultation with other counsel) and presenting positions on substantive and procedural

issues during the litigation," as well as working with opposing counsel and coordinating discovery.  *Id.* §

20.221.  The Manual counsels that the Court should make sure that the attorney appointed as lead counsel

has the qualifications, experience, and respect to fill this role.  *Id.* § 20.224.  While more than one attorney

can serve as lead counsel, the Manual recommends limiting the number so as not to defeat the purpose of

appointing a lead counsel.  *Id.* § 20.221.

One of the proposals presented to the Court regarding the appointment of Boies, Schiller and Scott

& Scott was characterized as a negotiated deal between counsel, combining counsel representing the first-

filed complaint and counsel representing the Plaintiff with the largest alleged damages.  There are several

problems with such a proposal.  First, the Manual warns the Court against accepting deals of counsel at

face value without making an independent evaluation.  *Id.* § 20.224.  Second, the limited number of named

Plaintiffs and of counsel in this case suggest that the appointment of one firm as lead counsel would be both

sufficient and most efficient.  Finally, consideration of  the "first-to-file" status when making lead counsel

determinations has been rejected by many courts.  *See In re Century Business Servs. Secs. Litig.*, 202

2

F.R.D. 532, 536–37 (N.D. Ohio 2001) (noting that one of the primary purposes behind the Private Securities Litigation Reform Act was to eliminate this rule). Absent evidence that the first-to-file should be credited with conducting substantial investigative efforts to ferret out the alleged improprieties, no weight is generally accorded to the timing of a particular plaintiff's complaint. *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 82 (S.D.N.Y. 2000). Here, given the long history of governmental investigation and prosecution of the scrap metal industry in the relevant market, and the respective timing of all of the filings, first-to-file status is simply not meaningful. *Id.*

The Court finds that all three firms asking to be appointed lead counsel have the qualifications and experience to fill that role. The resumes submitted to the Court amply demonstrate that all three firms and their lawyers are more than capable, as they have in the past, of acting as lead counsel in complex class actions. Given the excellence of the proposed lead counsel, the Court must turn to other factors to determine which firm it should appoint as lead counsel.

The Court initially considered requesting, as mentioned in the Manual, competitive bids. After further consideration, however, the Court finds that such an approach, in this case, would be inappropriate.[2] There appears to be limited information regarding the potential damages involved in this action, and, as such, the Court is concerned that it will be difficult at this stage for counsel to accurately assess any potential recovery when determining its bid. Without such information, a potential conflict of interest can be created between the class and its counsel if counsel's initial projections turn out to be inaccurate. The Court is also concerned that the small number of firms participating would not be sufficient to create the

---

[2] That is not to say, however, that under different circumstances the Court would find such a competitive bidding process an appropriate mechanism for selecting lead counsel.

3

type of "market" envisioned by the competitive bidding process.

Thus, although not binding, the Court turns to the Private Securities Litigation Reform Act ("PSLRA") for guidance.[3]  Under the PSLRA, the Court would determine the most adequate plaintiff and look to its choice of counsel.  The most adequate plaintiff is the one that has filed a timely motion for appointment as lead plaintiff, has the largest stake in the case, and satisfies the prerequisites for maintaining a class action under Fed. R. Civ. P. 23(a). 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)–(cc). A plaintiff meeting all three requirements is presumed to be the most adequate or lead plaintiff.  In this case, Lincoln Electric has submitted a proposal for the appointment of lead counsel, is conceded to be the plaintiff with the largest stake in the litigation, and otherwise appears to satisfy the requirements of Rule 23(a).  Thus, the Court considers Lincoln Electric to be the "most adequate plaintiff" and looks to its  recommendations for the appointment of lead counsel.  Presumably, the plaintiff with the largest stake in the litigation will be more likely to monitor and control its counsel, and be more likely to demand that counsel seek only reasonable fees in connection with any settlement or award in this matter.  It is clear, moreover, that these presumptions are not merely hypothetical—Lincoln Electric's in-house counsel both appeared at the hearing and addressed the Court regarding the scope of its stake in the litigation.  While Lincoln Electric has recommended that the firms of Boies, Schiller and Scott & Scott serve as co-lead counsel, its retained counsel is only the former.  As previously noted, moreover, the Court is disinclined to appoint more than

---

[3]  The Court invited suggestions from counsel regarding alternative mechanisms for assessing the economic impact of its choice of lead counsel.  Although counsel recognized the need for the Court to make such an assessment and had differing views as to the benefits of the bidding process, no alternative to that process was proposed.  While the Court has resolved the lead counsel question through other forms of inquiry, it remains concerned with and will remain vigilant with respect to the economic impact of its choice on the class.

4

one lead counsel in this case.[4]

Taking the above factors and proposals into consideration, the Court makes the following rulings:

1.    The Court appoints the firm of Boies, Schiller & Flexner, LLP to serve as lead counsel.

2.    The Court appoints the firm of McDonald, Hopkins, Burke & Haber Co., L.P.A. to serve as liaison counsel.

3.    The Court appoints an executive committee comprised of Richard Drubel and William Isaacson of Boies, Schiller & Flexner, LLP; John R. Climaco of Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.; David Scott of Scott & Scott; Steven M. Weiss of the Law Office of Steven M. Weiss; and Edmund Searby of McDonald, Hopkins, Burke & Haber Co., L.P.A.

4.    Lead counsel shall be responsible for:[5]

   a.    coordinating the activities of Plaintiffs during pretrial proceedings;

   b.    determining the position of Plaintiffs on all matters arising during the pretrial proceedings and presenting such positions orally or in writing to the Court and opposing parties (personally or by a designee);

   c.    coordinating the initiation and conduct of discovery on behalf of Plaintiffs consistent with the requirements of the Federal Rules of Civil Procedure;

   d.    conducting settlement negotiations on behalf of Plaintiffs;

   e.    delegating responsibilities for specific tasks to other counsel for Plaintiffs in a manner to

---

[4] It is also true that, while all counsel are certainly well qualified, the Boies, Schiller firm seems to have an edge in terms of experience in the antitrust arena.

[5] The Court does not, at this point, make any determination with respect to lead counsel's trial and post-trial responsibilities.

assure that pretrial preparation for plaintiffs is conducted effectively, efficiently, and economically;

    f.     monitoring the activities of co-counsel to assure the schedules are met and unnecessary expenditures of time and expense are avoided; and

    g.     performing such other duties as may be incidental to proper coordination of Plaintiffs' pretrial activities or authorized by further order of the Court.

5.    Liaison counsel shall be responsible for:

    a.     coordinating communications between the Court and counsel;

    b.     convening and organizing meetings of counsel;

    c.     advising parties of developments of the case; and

    d.     otherwise assisting in the leadership and prosecution of class allegations.

6.    The executive committee shall consult regularly with lead counsel, working to coordinate all aspects of the litigation with lead counsel, including the formulation and drafting of discovery, pleadings, briefs, and motion papers. It remains, however, lead counsel's responsibility to direct the overall structure, position, and direction of the litigation.

7.    All Plaintiffs' counsel shall, by no later than the tenth day of each month, submit a record of time expended and expenses incurred the immediately preceding month to lead counsel. All such submissions shall be made in a manner and form directed by Plaintiffs' lead counsel. The Court will seek periodic reports from lead counsel with respect to these matters.

8.    By August 15, 2002, Plaintiffs shall file and serve a consolidated amended complaint (the "Consolidated Complaint") on counsel for Defendants. Defendants shall answer, object or

otherwise respond with respect to the Consolidated Complaint no later than thirty (30) days after it is filed. A motion to dismiss, if filed, will not relieve Defendants of the obligation to file an answer to the Consolidated Complaint and will not operate to stay discovery. Any motion to stay discovery or any other proceeding in this action must be filed within fourteen (14) days of the filing of the Consolidated Complaint. Defendants shall not respond to the complaints already filed in the related cases pending in this district.

9.      Plaintiffs will make a determination of whether Ferrous Processing & Trading Co. will be voluntarily dismissed by a date no later than the date on which the Consolidated Complaint is filed.

10.     When a case that relates to the subject matter of the consolidated actions is hereafter filed in this Court or transferred here from another court, the Clerk of this Court shall:

a.      Place a copy of this Order in the separate file for such action.

b.      Mail a copy of the Order of assignment to counsel for plaintiffs and to counsel for defendants in the consolidated actions.

c.      Mail to the attorneys for plaintiffs in the newly filed or transferred case a copy of this Order and to any new defendant(s) in the newly filed or transferred case.

d.      Make an appropriate entry in the Master Docket.

11.     This Court requests the assistance of counsel in calling to the attention of the Clerk of the Court the filing or transfer of any case that might properly be consolidated as a part of this action.

12.     This Order shall apply to each case subsequently filed in this Court or transferred to this Court unless a party objecting to the consolidation of such case or to any other provision of this Order shall, within ten days after the date upon which a copy of this Order is mailed to counsel for such

7

party, file an application for relief from this Order or any provision herein and this Court deems it

appropriate to grant such application.

13.    Notwithstanding the Court's earlier order, the consolidated cases shall be captioned *In Re: Scrap*

*Metal Antitrust Litigation.*


As to the remaining case management issues, the Court orders the following:

1.    The consolidated cases are assigned to the complex tract.

2.    The consolidated cases are designated for electronic filing.

3.    The consolidated cases are not suitable for Alternative Dispute Resolution mechanisms at this time.

4.    The parties do not consent to the jurisdiction of a United States Magistrate Judge, pursuant to 28

U.S.C. § 636(c).

5.    The non-expert discovery cutoff date is March 28, 2003.[6]

6.    Rule 26 disclosures are due by September 25, 2002.[7]

7.    Motions for class certification are due by November 13, 2002.  Opposition briefs are due by

December 13, 2002.  Reply briefs are due by December 27, 2002.

8.    Expert reports from the party bearing the burden of proof on the issue for which expert testimony

is proffered are due no later than March 28, 2003.  Responsive expert reports are due no later

than May 12, 2003.  The expert discovery cutoff date is June 26, 2003.

---

[6]  Discovery on the merits will proceed simultaneously with discovery on issues relating to the propriety of class certification.

[7]  Rule 26 obligations are mandatory in the absence of an order by the Court staying those obligations.

9.      The cutoff for joining new parties and amending the pleadings is December 13, 2002.

10.     The dispositive motion cutoff date is August 11, 2003.  Opposition briefs are due by September

10, 2003.  Reply briefs are due by September 25, 2003.

11.     The Court sets a status hearing for October 9, 2002 at 12:30 p.m. in Room 16A, U.S.

Courthouse, 801 West Superior Avenue, Cleveland, Ohio.

**IT IS SO ORDERED.**

<u>s/Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**